[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11966
_____

D.C. Docket No. 5:07-cv-00444-WTH-DAB


ANTHONY JOHN PONTICELLI,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(August 16, 2012)

Before PRYOR, MARTIN and EDMONDSON, Circuit Judges.

PRYOR, Circuit Judge:

Anthony Ponticelli, a Florida prisoner sentenced to death for the murder of

two brothers, Nick and Ralph Grandinetti, raises two issues about the denial of his

petition for a writ of habeas corpus. First, Ponticelli argues that the prosecution

violated his right to due process when it allegedly suppressed evidence of and failed to correct false testimony about an agreement to provide immunity for a witness for the state and about Ponticelli's use of cocaine shortly before the murders, see Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); see Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972). Ponticelli contends that the ruling of the Supreme Court of Florida—that the prosecution did not violate his due process rights and that, even if it did, he suffered no prejudice—is contrary to or an unreasonable application of clearly established federal law and an unreasonable determination of the facts. 28 U.S.C. §2254(d). Second, Ponticelli argues that his trial counsel provided ineffective assistance by failing to present evidence of Ponticelli's incompetence to stand trial and by failing to present mitigating evidence of drug use and mental health problems during the penalty phase. See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Ponticelli contends that the ruling of the Supreme Court of Florida—that trial counsel did not render deficient performance before and during the competency hearing, and that any deficiencies by counsel during the penalty phase did not prejudice Ponticelli—is contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). Ponticelli's arguments fail. The Supreme Court of Florida on the first issue, reasonably determined the underlying

2

facts and, on both issues, neither contravened nor unreasonably applied clearly established federal law.  The denial of Ponticelli's petition for a writ of habeas corpus is affirmed.

## I. BACKGROUND

Anthony Ponticelli owed Nick and Ralph Grandinetti money for cocaine so he hatched a plan to lure the brothers into a car to drive to a back road, away from their home, where he murdered them with a gun he had borrowed from a friend. Ponticelli shot Ralph once in the head and Nick twice in the head and later abandoned them to die in the car.  Ralph died from the gunshot wound within one or two minutes of being shot.  Nick was found a day later, curled up on the floorboard in the front of the car, covered in blood, gasping for air, and kicking his foot.  Nick felt pain until he became comatose, and later died from cardiac arrest secondary to the gunshot wounds.  In addition to his gunshot wounds, Nick suffered bruises to the back and side of his head, which were consistent with blunt force trauma, and a burn of his right ear.

The discussion of the procedural history of this appeal is divided into several parts.  Part A discusses the pretrial determination of competency.  Part B discusses the guilt phase of Ponticelli's trial.  Part C discusses the penalty phase of Ponticelli's trial.  Part D discusses the decision of the Supreme Court of Florida on

3

direct appeal. Parts E and F discuss the state postconviction proceedings. Part G discusses the proceedings in the district court.

*A. Pretrial Determination of Competency*

After Ponticelli was charged with two counts of first degree murder and one count of robbery with a deadly weapon, Ponticelli's counsel moved for an evaluation of his client's competency. The trial court then appointed three mental health experts to evaluate Ponticelli's competency to stand trial: Dr. Harry Krop, Dr. Rodney Poetter, and Dr. Robin Mills. At a pretrial hearing, both Dr. Krop and Dr. Poetter testified that Ponticelli was competent, but Dr. Mills testified that Ponticelli was incompetent because he suffered from a delusional thought process. The state trial court found Ponticelli to be competent. Ponticelli v. State (Ponticelli I), 593 So. 2d 483, 487 (Fla. 1991).

*B. Guilt Phase*

The prosecution built its case on both physical evidence and the testimony of several witnesses who testified that Ponticelli planned to kill the brothers, carried out that plan, and then bragged about it. At the conclusion of the guilt phase, the jury convicted Ponticelli, so in our review of the evidence from the guilt phase, we are obliged to construe the record in the light most favorable to the

4

government.  See Lewis v. Jeffers, 497 U.S. 764, 781–82, 110 S. Ct. 3092, 3102–03 (1990).

On November 27, 1987, the Friday after Thanksgiving Day, Ponticelli drove to the Grandinetti brothers' trailer in Silver Springs Shores, Florida, with a .22 caliber handgun that he had borrowed from his friend, Joseph Leonard.  Ponticelli had bought large amounts of cocaine from the brothers on at least 15 occasions, and he owed the brothers between $200 and $300 for some of those drugs.  Ponticelli planned to kill the brothers and rob them of cocaine and money.  Ponticelli considered killing the brothers in their trailer, but decided against it, because too many other people were present, including the brothers' roommate, Timothy Keesee.

Ponticelli decided to lure the brothers away from their trailer by pretending to sell cocaine for them.  Ponticelli asked the brothers if he could settle his debt by selling whatever cocaine they had.  The brothers agreed and Ponticelli made fake telephone calls to make the brothers believe that he was finding purchasers for their cocaine.  At trial, Keesee testified that he had seen cocaine at the trailer on the night of the murders, but denied that anyone present at the trailer—including Ponticelli—had used cocaine that night.

5

Ponticelli directed the brothers to the purported customers' residences, including the house of Keith Dotson. Ponticelli had visited Dotson earlier that day and had watched part of the movie "Scarface" with Dotson; Dotson's cousins, Ed and Warren Brown; and their friend, Brian Burgess. When Ponticelli and the brothers arrived at Dotson's home, Ponticelli left the brothers in the car.

Inside Dotson's house, Ponticelli showed Ed Brown and Burgess a gun and told them that there were two people in the car who he planned to kill for cocaine and money. Ponticelli asked Brown and Burgess if they would be willing to give him a ride home after he murdered the Grandinetti brothers. At trial, Ed Brown, Burgess, and Dotson testified that they had not met Ponticelli before that day.

After he returned to the car, Ponticelli directed the brother to drive to nearby back roads. From the back of the car, Ponticelli then shot Ralph once and Nick twice in the head with Leonard's gun. Ponticelli threw Ralph into the back of the car. When Nick moaned, Ponticelli repeatedly hammered Nick's head with the butt of the gun because he had no more bullets. Ponticelli then pushed Nick onto the floorboard of the car. Heat from the floorboard seared Nick's ear.

Ponticelli drove to Leonard's house to return the gun and to seek his advice. Ponticelli approached a window and called Leonard outside. He gave Leonard the gun back and told Leonard that he "did Nick." Leonard understood Ponticelli to

6

mean that he had murdered Nick. Ponticelli returned to the car and began driving, but eventually abandoned the bodies and the car because of a flat tire. He called a taxi cab and returned to Dotson's house around 11:00 or 11:30 p.m.

With his right knee covered in blood, Ponticelli entered Dotson's house "looking for an alibi." Ponticelli announced to Ed Brown, Dotson, and Burgess, "I did it, dudes," and asked the men to "give him an alibi . . . that he had stayed there . . . all night." He explained that he "had killed two guys for $2,000 and some cocaine." Ponticelli stated that he had shot each man in the back of the head and afterward "drove them out somewhere and left them" because he had a flat tire. Ponticelli showed the Brown brothers and Burgess some cocaine in small plastic packets and a large roll of money. At trial, Ed Brown denied that anyone used cocaine with Ponticelli after he returned to Dotson's house. Ponticelli asked Ed Brown if he were "to shoot someone . . . in the head with a gun" did he "think that they would live?" Ponticelli told Ed Brown, Dotson, and Burgess that he was worried because "one of the guys w[as] moaning or both of them."

Ponticelli then called his mother and told her that he was working out with some friends, but would be home in about 30 minutes. Dotson helped Ponticelli wash his clothes to remove the blood stains and Ponticelli folded the clean clothes and placed them in a brown bag. Afterward, Warren Brown and Burgess drove

7

Ponticelli  back to his house.  Ponticelli instructed Brown and Burgess to "drive around the block a couple of times" because he "was afraid the police might spot him out . . . and catch him."

The day after the murder, Ponticelli and his friend, John Turner, asked Turner's friend, Ronald Halsey, if they could burn trash behind Halsey's house. Halsey agreed.  Halsey later inspected their progress and "noticed that there was a black looking coat on top of the fire."  When Halsey inquired about the clothes, Ponticelli "broke down and told [Halsey] . . . that . . . he shot the two boys, Nick and Ralph."  Ponticelli told Halsey that he owed Nick money for cocaine and that Nick and Ralph had "roughed him up."  Ponticelli stated that "they were driving somewhere" to "sell more coke" and, when they "came to a stop," he took out a gun and "shot the driver twice in the back of the head and then he shot the passenger twice in the back of the head."  Ponticelli told Halsey that "he knew after he shot one of them that he had to kill both of them because of witnesses." He said that he hoped to dispose of the brothers' bodies "out of state," but a flat tire foiled his plan.  Ponticelli confessed that he took "eight or nine grams of crack" and "like $900 cash off the bodies," and he admitted that he and Turner smoked all of the crack and spent most of the money on more crack.  Ponticelli stated that he intended to leave Florida to escape the authorities.

8

Ponticelli then returned to Leonard's house, where he told Leonard that the Grandinettis had "harass[ed] him for some money," and that "they weren't going to let him leave because he owed them some money." Ponticelli admitted that he directed the brothers around "back roads" where he shot and killed them. He stated that he took a few hundred dollars and cocaine from the car. Ponticelli also told Leonard, soon after Ponticelli returned Leonard's gun, that he had noticed that the car had a flat tire so he had left the bodies and had taken a cab home.

Ponticelli openly discussed his plans to cover up his crime. He told Leonard that he burned the clothes he had worn when he killed the brothers. He told Leonard and Leonard's roommate, Bobby Meade, that he planned to escape to Canada or Mexico. He told Leonard and Meade that, if questioned by the police about the murder, he planned to either deny being with the Grandinettis after 9:00 p.m. or he would lie and say that "he was with them and some guy was with them, too, and that the guy had shot them and let [Ponticelli] go." When Ponticelli returned to Dotson's house, he showed Dotson his car and told Dotson that he planned to "fix this car up . . . with the money that he got and use it as a getaway car."

After his arrest, Ponticelli confessed his crime to his jail cellmate, Dennis Freeman. Ponticelli admitted to Freeman that he made several telephone calls

9

from the Grandinetti's trailer to trick the brothers into believing that he planned to sell cocaine for them. Ponticelli told Freeman that the brothers drove him to Dotson's house and that, after he left Dotson's house, he shot the brothers in their car "to rob them of . . . cocaine and . . . money." Ponticelli told Freeman that he returned the gun to Leonard and asked Leonard to "get rid of it." Ponticelli told Freeman that he and Leonard discussed burning the bodies, but that he instead eventually abandoned the bodies in the car because of a flat tire. Ponticelli admitted that he took between $700 and $800 and cocaine from the bodies and then took a cab to Dotson's house, where he washed his clothes and told everyone at the house about the murder. He stated that the next day he burned his clothes and buried the burnt remains in a backyard. When Freeman asked Ponticelli if he had "been doing any drugs or drinking, heavily or whatever" on the day that he killed the brothers, Ponticelli denied it.

Ponticelli also asked Freeman if he would help dispose of some evidence and drew Freeman a map with the location of that evidence. The map had Dotson's name and telephone number on it. At trial, the state introduced the map into evidence.

Freeman testified that he had not received any benefit for his testimony against Ponticelli. He also testified that he had been convicted of 26 felonies, all

of which involved dishonesty. On cross-examination, Freeman admitted that he was a "jailhouse snitch" who had provided information to law enforcement for the past ten years and that he had earned money through participation in a reverse sting operation.

After the state rested, the trial court entered a judgement of acquittal on the robbery charge. The defense then presented evidence that Ponticelli was a cocaine addict who had suffered from cocaine psychosis. In his opening statement, defense counsel argued that Ponticelli's cocaine addiction prohibited him from forming the requisite intent to kill the brothers and that there was reasonable doubt as to whether Ponticelli had even shot the brothers.

Ponticelli's father, Michael Ponticelli Sr., testified that the family had moved from Long Island, New York, to the Silver Springs Shores area of Florida a little more than two years before the trial. Michael told the jury that around Labor Day 1987, the family visited New York for about a month. When the family returned to Florida in early October, Ponticelli stayed behind in New York for another three weeks. When Ponticelli returned to Florida, Michael noticed that his son had changed. Michael described Ponticelli as argumentative, short tempered, and "very nervous, very thin, very agitated."

11

John Turner testified that he had known Ponticelli since he had moved to Florida from New York and that, after Ponticelli's return from his recent trip to New York until the day before the murders, he and Ponticelli had used cocaine every day. Turner testified that neither he nor Ponticelli worked and instead smoked cocaine "all day long" from eight or nine in the morning to three or four the next morning. Turner admitted that, before Ponticelli had returned from his latest trip to New York, he had never seen Ponticelli use cocaine. On cross-examination, Turner testified that he could not recall whether he had seen Ponticelli on the day of the murders. When asked whether he knew whether Ponticelli had used cocaine that day, Turner testified, "I don't know, you know . . . . I mean, I'm saying maybe we did that morning. It's been awhile. I can't really remember exactly. I know it wasn't that afternoon or that evening. I'm not—you know, I don't think I seen him."

Joseph Leonard and Bobby Meade also testified for the defense. Leonard stated that before Ponticelli returned from his latest trip to New York he was "real reliable" and that, when he returned, he was "not like himself." Meade agreed that before Ponticelli visited New York he had been a "good friend" who was "dependable" and "bubbly goofey." Meade testified that, after Ponticelli returned from New York, "he was more quiet. He didn't talk as much like he used to. . . He

12

kept everything inside of him, and he would get like upset about little things."

The defense attempted unsuccessfully to present the testimony of Dr. Mark Branch, an expert in behavioral pharmacology. The defense offered to have Dr. Branch present expert opinion testimony about the effects of cocaine on the mind and body and to explain cocaine psychosis, but Branch could offer no testimony on the elements of the insanity defense. The state objected to Dr. Branch's testimony on the grounds that Branch had never interviewed Ponticelli, that Branch's research had been limited to primates, and that Branch was not qualified to testify that Ponticelli had suffered from cocaine psychosis at the time of the murders. The trial court excluded Dr. Branch's testimony.

The jury convicted Ponticelli of both murders.

*C. Penalty Phase*

During the penalty phase, the state presented no new evidence, but the defense presented the testimony of Dr. Robin Mills, who had evaluated Ponticelli for fifteen minutes before the trial for legal competence and sanity. Based on a hypothetical question, which assumed that Ponticelli had no history of cocaine use before October 1987, Dr. Mills testified that Ponticelli's changes in his personality

were symptoms of someone who suffered from an extreme mental or emotional disturbance induced by repeated exposure to illegal drugs. Defense counsel posed another hypothetical question, which assumed that Ponticelli had smoked cocaine "every day, all day, up until [the day before the murders]"; that a few hours before the murders, Ponticelli revealed his plan to four people who he had known for "only four hours" while acting "nervous," "hyper," and "paranoid"; and that after the murder, Ponticelli confessed the crime to these four people, washed his clothes, asked for an alibi, called his mother, and arranged a ride home. Dr. Mills testified, in response to that hypothetical question, that he believed that Ponticelli had suffered from a drug-induced extreme mental or emotional disorder or disturbance when Nick and Ralph were murdered and that Ponticelli's capacity to appreciate the criminality of his conduct or to conform his conduct to law had been substantially impaired. Dr. Mills testified that he believed that the statutory mental health mitigators should apply even if Ponticelli had not consumed any cocaine on the day of the murders: "The . . . effect [of cocaine] on the . . . intellectual capacities can persist, in some cases, for a year after the intoxication . . . so one day later, to his brain, would not make that much difference." On cross-examination, Dr. Mills admitted that Ponticelli "probably . . . had the ability to

14

know right from wrong" and that there "was some evidence" that he had the ability to understand the consequences of his actions.

During closing argument of the penalty phase, the prosecutor told the jury that, although Ponticelli had used a lot of cocaine, "there was no evidence at all . . . that he had used cocaine [the day of the murders]; none whatsoever." The prosecutor also reminded the jury that Ponticelli "voluntarily chose to use cocaine . . . day in and day out . . . no one forced the defendant to use cocaine." The jury recommended two sentences of death by a vote of nine to three for the murders of Nick and Ralph Grandinetti.

The trial court imposed a sentence of death for each conviction. The trial court found two aggravating factors applicable to both murders: the murders were committed for pecuniary gain, Fla. Stat. § 921.141(5)(f), and the murders were "committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification," id. § 921.141(5)(i). The trial court also found that the murder of Nick Grandinetti was "especially heinous, atrocious, [and] cruel." Id. § 921.141(5)(h). The trial court found two statutory mitigators: Ponticelli had no significant history of previous criminal activity, id. § 921.141(6)(a), and Ponticelli was 20 years old at the time of the offense, id. § 921.141(6)(g). The trial court did not find the existence of any nonstatutory mitigator.

The trial court rejected Dr. Mills's hypothetical penalty phase testimony as speculative and declined to find the existence of either statutory mitigator about mental health. The court rejected the argument that Ponticelli had been "under the influence of extreme mental or emotional disturbance" when he killed the brothers, id. § 921.141(6)(b). And the court rejected the argument that Ponticelli's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law had been substantially impaired, see id. § 921.141(6)(f).

*D. Direct Appeal*

When the Supreme Court of Florida affirmed Ponticelli's convictions and sentences on direct appeal, Ponticelli v. State (Ponticelli I), 593 So. 2d 483 (1991), the court rejected Ponticelli's argument that the trial court erred when it rejected the two statutory mitigators about mental health. With regard to the extreme mental or emotional disturbance mitigator, Fla. Stat. § 921.141(6)(b), the state supreme court agreed with the trial court that Dr. Mills's testimony was speculative because "Ponticelli had not discussed his mental processes or any of the details of the offense with Dr. Mills." Ponticelli I, 593 So. 2d at 491. Dr. Mills relied only on a description of "Ponticelli's use of cocaine and . . . hyperactivity on the evening of the murders, although there was no evidence of drug use on the evening of the murders." Id. With regard to whether Ponticelli's

16

capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, Fla. Stat. § 921.141(6)(f), the state supreme court determined that "there was no evidence that Ponticelli was using cocaine at the time of the murders" and that "Ponticelli's actions on the night of the murder evinc[ed] that his capacity to appreciate the criminality of his conduct was not impaired." Ponticelli I, 593 So. 2d at 491. The state supreme court concluded that "competent substantial evidence" supported the finding of the trial court that the mitigator did not apply. Id.

The Supreme Court of the United States granted Ponticelli's petition for a writ of certiorari, vacated the judgment of the Supreme Court of Florida, and remanded for reconsideration in the light of Espinosa v. Florida, 505 U.S. 1079, 1082, 112 S. Ct. 2926, 2929 (1992). Ponticelli v. Florida, 506 U.S. 802, 113 S. Ct. 32 (1992). On remand, the Supreme Court of Florida again affirmed Ponticelli's sentences and concluded that any error under Espinosa was procedurally barred. Ponticelli v. State (Ponticelli II), 618 So. 2d 154, 154–55 (Fla. 1993).

*E. First State Postconviction Motion and Evidentiary Hearing*

On April 11, 1995, Ponticelli filed a motion for postconviction relief in the state trial court. See Fla. R. Crim. P. 3.851. Ponticelli amended his motion several times and included numerous claims, including the claims before us now. The

17

trial court held two evidentiary hearings and Ponticelli presented testimony from 27 witnesses, including his trial counsel, the prosecutor, the lead detective, numerous lay witnesses, and four expert witnesses. The state called an expert witness, psychologist Dr. Wayne Conger, in rebuttal.

The discussion of the evidence presented at the first evidentiary hearing is divided into two parts. The first part discusses the evidence related to Ponticelli's due process claims and why the Florida courts rejected those claims. The second part discusses the evidence related to Ponticelli's background and mental health and why the Florida courts rejected Ponticelli's claims of ineffective assistance of counsel.

### 1. Brady and Giglio Evidence

As to the evidence Ponticelli presented in support of his claims that the state had violated his right to due process of law, see Brady, 373 U.S. 83, 83 S. Ct. 1194; Giglio, 405 U.S. 150, 92 S. Ct. 763, the Supreme Court of Florida divided Ponticelli's claims into three categories. First, the Supreme Court of Florida considered the alleged suppression of and false evidence about an alleged agreement to provide immunity for Dennis Freeman, the jailhouse informant. Second, the Supreme Court of Florida considered the alleged suppression of Timothy Keesee's statements to the lead detective, Investigator Bruce Munster,

18

and the prosecutor, Sarah Williams, that he saw Ponticelli use cocaine at the Grandinetti's trailer on the night of the murders, and Keesee's false trial testimony about that matter. Third, the Supreme Court of Florida considered the alleged suppression of evidence and false testimony related to an alleged Thanksgiving Day cocaine party at Dotson's house, which lasted until almost the dawn of the next day and during which the Brown brothers, Burgess, and Dotson smoked cocaine with Ponticelli, contrary to their trial testimony that the first time they met Ponticelli was on the evening of the murders. This discussion addresses these categories of evidence in the same order.

a. Dennis Freeman's Alleged Immunity Deal

During the first postconviction evidentiary hearing, Ponticelli presented evidence to support his argument that the state had violated his right to due process by suppressing evidence, see Brady, 373 U.S. 83, 83 S. Ct. 1194, and by presenting false testimony, see Giglio, 405 U.S. 150, 92 S. Ct. 763, about an alleged deal that the prosecution had made with Freeman in exchange for his testimony against Ponticelli. Ponticelli's counsel asked Williams about a note that she had written to herself during the trial, which stated, "Spoke with Fred Landt [Freeman's defense counsel] regarding Dennis Freeman. Told him I would make no firm offer prior to [Ponticelli's] trial but assured him his cooperation would be

19

remembered with favor before mitigating judge/Sturgis. Will make no formal deal on the record prior to trial." Williams testified that Freeman "had been promised nothing for his testimony," and that she did not know whether Freeman had later received any favorable treatment.

The Supreme Court of Florida rejected Ponticelli's arguments about the alleged deal with Freeman. With respect to Ponticelli's Brady claim, the court stated that, "even if one accepts defense counsel's testimony as sufficient to establish" that the evidence was favorable to Ponticelli and that the evidence was suppressed by the state, either willfully or inadvertently, "Ponticelli's claim still fails because Ponticelli has not established that the State's failure to disclose this evidence resulted in prejudice." Ponticelli III, 941 So. 2d at 1085. The court rejected Ponticelli's argument that the note would have provided a basis for impeaching Freeman. The court reasoned that Freeman's testimony "was merely cumulative to that presented at trial"; Freeman's long criminal record and history of cooperation in exchange for benefits had "significantly impeached . . . his motive for testifying and his capacity for truthfulness"; and the map that Ponticelli had given Freeman in addition to the testimonies of other witnesses corroborated Freeman's testimony. Id. at 1085–86. With respect to Ponticelli's Giglio claim, the court held that, "even if we accept Ponticelli's allegation that the prosecutor's

20

note indicates that Freeman was not honest when he testified that he did not expect to receive a benefit from cooperating in Ponticelli's case, we find no prejudice." Id. at 1089. Again, the court reasoned that Freeman "was significantly impeached on his capacity for truthfulness and his incentive for testifying against Ponticelli." Id. The court opined that "informing the jury that Freeman might be testifying falsely because of his hope for an unguaranteed, unspecified award would not have rendered him sufficiently less credible in the jury's eyes to establish a reasonable possibility that this contributed to the verdict." Id. (internal quotation marks omitted).

### b. Cocaine Use at the Trailer

Ponticelli also presented evidence to support his argument that the state had violated his right to due process by suppressing evidence, see Brady, 373 U.S. 83, 83 S. Ct. 1194, and by presenting false testimony, see Giglio, 405 U.S. 150, 92 S. Ct. 763, about whether Timothy Keesee had seen Ponticelli use cocaine at the Grandinetti's trailer on the night of the murders. During the postconviction hearing, Keesee testified that he had lied at trial and had, in truth, seen Ponticelli snort "one line of [cocaine] that was about two matchsticks long" sometime between 7:30 and 8:00 p.m. at the Grandinettis's trailer on the night of the murders. Keesee testified that, when Williams interviewed him about Ponticelli,

21

he was "positive" that he told her that he, the Grandinettis, and Ponticelli had used cocaine that night. On cross-examination, he admitted that he didn't "recall [Williams] asking specifically if Ponticelli did cocaine. She said: 'Did you all do some cocaine.' And I said, 'Yes we did; one line." Keesee testified too that he told Investigator Munster that he left the trailer with his brother because "at the time my brother was in the Navy, and they had coke out, and we had done a line of coke, and I knew my brother was uncomfortable . . . ." Keesee admitted that he told Ponticelli's trial counsel that no one had used cocaine on the night of the murders because "[o]ne line wasn't enough to influence me to say that we did coke." Keesee testified that he had abused drugs at the time of trial and he lied to "get out of the spotlight . . . it would bring more trouble on me if I didn't cooperate. So I was trying to play ball and just get the past past me." Keesee testified that Munster had searched his car and found drug paraphernalia. When Munster did not say anything, Keesee believed that Munster would "go light on [him]" in exchange for his cooperation. He also testified that Williams had asked him questions during trial preparation like "Did ya'll do any coke," and when he said, "no," Williams would reply, "Okay, good." Keesee testified that he "could tell by her response . . . [that he] was helping her case." Despite his cooperation,

22

Keesee admitted that he was charged with possession of cocaine a month before the prosecution took his deposition in Ponticelli's case.

Investigator Munster testified that Keesee told him he left the Grandinettis's trailer on the night of the murder because of "cocaine usage" there. Munster included this information in a supplemental report dated December 1987 that stated that Keesee left the Grandinettis's trailer on the night of the homicides because of cocaine usage taking place there and because of a cocaine deal occurring between Nick, Ralph, and a white male identified as Tony. Munster provided Ponticelli's trial counsel this report.

The prosecutor, Williams, denied that she knew that Ponticelli had smoked cocaine on the night of the murders. Williams acknowledged that she had written a note that stated, "Owed them $300. R and N wanted it. Not physical. No threats. He was making calls to sell coke, collect money, doing cocaine," but she could not remember who "he" was. Williams also acknowledged that she had written a note on Keesee's deposition testimony that Keesee "[d]idn't see them do cocaine. Didn't tell anyone," and that she had underlined "Didn't tell anyone," and had written in the margin "Told BM. Taped." She testified that she didn't remember why she wrote the note, but that she did not believe that Keesee had

23

made an inconsistent statement because "[o]ftentimes I'll put a question mark next to [an inconsistent statement] and there's not a question mark."

The trial court determined that Williams's notes were neither exculpatory nor material. With respect to Williams's first note about an unidentified individual who had used cocaine, the trial court held that "there is no way of knowing whether [defense counsel] would have gathered from the note[s] that [Ponticelli] was using cocaine at the trailer on the night of the murders," and in the light of the "overwhelming evidence of Ponticelli's guilt, no reasonable probability exists that the evidence regarding drug usage found in [Williams's] interview notes would have changed the outcome of the guilt or penalty phase of Ponticelli's trial." See Ponticelli III, 941 So. 2d at 1086 (internal quotation marks and alterations omitted). With respect to Williams's second note about Keesee's allegedly inconsistent statement, the trial court "found no evidence that the State either knowingly presented, or allowed to be presented, perjured testimony at trial." See id. at 1090 (internal quotation marks omitted). The court "recognized that Keesee testified adamantly at deposition and at trial that he did not see Ponticelli use cocaine on the day of the crimes, and that references to drug use found in the state investigator's and [Williams's] notes are vague." See id. (internal quotation marks and alterations omitted). The court concluded, "It is

24

understandable that [Williams] and [Munster] could have overlooked vague statements in their notes when faced with this testimony." See id.

The Supreme Court of Florida agreed with the ruling of the trial court that, even in the light of Keesee's testimony, the prosecutor's notes were neither exculpatory nor material. The court reasoned that Williams's note about an unidentified individual who had used cocaine did "not clearly indicate that Ponticelli was the person Keesee witnessed using cocaine on the night of the murders," and trial counsel could have confronted Keesee with Munster's report, which "contained substantially the same information as the prosecutor's note." Id. at 1087. The court held that the findings of the trial court with respect to Williams's second note were "supported by competent, substantial evidence. The prosecutor's notation on Keesee's deposition testimony does not clearly indicate that the prosecutor knew Keesee was testifying falsely." Id. at 1090.

c. Cocaine Party

Ponticelli also presented evidence at the first evidentiary hearing that the state had violated his right to due process by suppressing evidence, see Brady, 373 U.S. 83, 83 S. Ct. 1194, and by presenting false testimony, see Giglio, 405 U.S.

25

150, 92 S. Ct. 763, about an alleged cocaine party that took place at Dotson's house the night before the murders. At the evidentiary hearing, Burgess and Ed Brown admitted that they had testified falsely at Ponticelli's trial. Contrary to their trial testimony that they had first met Ponticelli on the evening of the murders, both admitted that they had met Ponticelli either late on Thanksgiving night or in the early morning hours of the next day. Both testified that there was a party at Dotson's house on Thanksgiving Day and that they had smoked cocaine with Ponticelli at Dotson's house until the party had ended at around 4:00 a.m. the next day. The two men admitted too that they had used cocaine with Ponticelli the next night, after Ponticelli had murdered the Grandinettis. Both men testified that they had not told the prosecution about the cocaine party.

John Turner also testified about the cocaine party. He stated that he and Ponticelli had smoked cocaine with those present at Dotson's house, including the Browns, Burgess, and Dotson. Turner testified that he had provided this information to Ponticelli's trial counsel and to Munster.

Munster testified about two notes that he had written, which Ponticelli argued proved that Munster knew that Ponticelli had attended the cocaine party. The first note stated, "Went to someone's house to drop off girl. Both Tony and John are there. They are smoking coke out of an orange juice can." But Munster

26

could not remember to whom the pronoun "they" referred or on what night the incident allegedly took place. The second note stated, "At jail with Dennis Freeman. Thanks night. Tony says Tony and John and two guys from West Virginia, his cousin, went to Nick's house. . . . Tony bought eight ball of coke that night. . . . Tony went back to Keith's house afterwards." Munster testified that he could not remember whether he disclosed the note to Ponticelli's trial counsel and did not know if trial counsel would have thought that the note was material.

The Supreme Court of Florida determined that the evidence did not prove that the prosecution knew about the cocaine party and that, "even if they did, Ponticelli has not established that the suppression resulted in prejudice." Ponticelli III, 941 So. 2d at 1087. The court reasoned that the only "evidence tying the[] [first] note[] to Ponticelli's cocaine use at the time of the crimes was Ed Brown's testimony, and at the evidentiary hearing, Brown denied telling the State about the cocaine party." Id. at 1087–88. With respect to the second note, which allegedly proved that Ponticelli had told Freeman about the cocaine party, the court concluded that its suppression was not material because "Ponticelli refused to answer defense counsel's inquiries regarding Ponticelli's cocaine use at the time of the crimes" and "at trial, [the Browns and Burgess] contradicted this statement in their sworn testimony." Id. at 1088. With respect to Turner's alleged statement

to the state investigator, the court reasoned that, even if Turner had made the statement to Munster, defense counsel had that evidence.  Id.

The Supreme Court of Florida also rejected Ponticelli's argument that "the State violated Giglio by allowing Brian Burgess and Edward Brown to testify falsely at trial about the date they first met Ponticelli and whether they had ever seen Ponticelli use cocaine."  Id. at 1091.  The court held that the finding of the trial court that the state did not know that the witnesses had testified falsely was "supported by competent, substantial evidence."  Id.  The court determined that "there was no evidence presented at the evidentiary hearing that the State knew that Burgess or Brown testified falsely; in fact, Burgess and Brown testified at the evidentiary hearing that they never told the State they saw Ponticelli use cocaine the night before the crimes . . . ."  Id. at 1091–92.

## 2. Ponticelli's Background and Mental Health

Ponticelli also presented the testimony of his trial counsel, numerous lay witnesses, and various mental health experts about his trial counsel's investigation of Ponticelli's competency and potential evidence in mitigation.  He argued that his right to effective assistance of counsel, under the Sixth and Fourteenth Amendments, had been violated, see Strickland, 466 U.S. 668, 104 S. Ct. 2052,

28

because his trial counsel had failed to conduct an adequate investigation into his background and mental health, which Ponticelli argued prejudiced him.

Defense counsel testified that Ponticelli's trial was his first capital trial, that he did not know how to prepare for a penalty phase, that his only assistance came from a former deputy, and that the vast majority of his preparation was devoted to the guilt phase. To investigate evidence for mitigation, trial counsel talked with Ponticelli's parents and asked them for names of persons who Ponticelli knew as a child. Although Ponticelli's parents provided trial counsel with the names of some of Ponticelli's former teachers, employers, and family members, counsel did not contact any of them. Trial counsel did not consider medical or school records and testified that he had only a partial view of Ponticelli's drug use and background at the time of trial. Ponticelli III, 941 So. 2d at 1092. When asked about the lack of investigation into Ponticelli's past, trial counsel agreed that there was mitigating evidence he could have discovered and would have used during the penalty phase. Trial counsel also testified that, had he known more, he would not have conceded in the penalty phase the aggravating circumstance that the killings were cold, calculated, and premeditated.

At the first evidentiary hearing, several witnesses testified about Ponticelli's childhood. Ponticelli's sister testified that Ponticelli had been born a "blue baby,"

29

which Dr. Conger explained "means there was insufficient oxygen during the birth process." Ponticelli's sister explained that Ponticelli was placed in foster-care months after his birth, and later adopted by the Ponticelli family. Many witnesses described Ponticelli as a typical, quiet child who grew up in New York. A few witnesses described Ponticelli as socially-awkward and acknowledged that Ponticelli had worn glasses and was overweight.

Several witnesses described how Ponticelli started to abuse drugs as an adolescent. In junior high school, Ponticelli experimented with marijuana and beer. In high school, Ponticelli started to experiment with other drugs, including black beauties, mescaline, hash, Valium, and cocaine. The lay witnesses testified that, when Ponticelli was not using drugs, he was sweet and respectful. But when Ponticelli used drugs, he became paranoid and experienced mood swings.

The evidence established that, soon after Ponticelli graduated high school, his family moved to Florida where he stopped using cocaine and held a job. Ponticelli returned to his former relaxed demeanor. But it did not last. When he returned to New York in 1987 to attend a cousin's wedding, Ponticelli began using cocaine again. John Turner testified, as he did at trial, that he and Ponticelli started using cocaine nearly every day. And Turner was not the only witness to Ponticelli's return to cocaine use. Ponticelli also presented the testimony of Frank

Porcillo, who had not testified at the trial. After Porcillo befriended Ponticelli in Florida, they smoked marijuana and drank alcohol together. Porcillo did not know that Ponticelli used cocaine until after Ponticelli returned from a trip to New York several weeks before the murders. After the New York trip, Porcillo became aware that Ponticelli was smoking cocaine and noticed changes in his behavior. Porcillo witnessed Ponticelli use cocaine once after he returned from New York and observed that Ponticelli acted "paranoid, looking around all the time, just not easy to be around," and "[h]iding in the corner."

Porcillo's testimony suggested that Ponticelli used cocaine on the night of the murders. Porcillo testified that he encountered Ponticelli around 8:00 p.m. at a convenience store on the night of the murders. Ponticelli approached a car in which Porcillo was a passenger and spoke to him and other occupants of the car. Ponticelli kept his hands in his jacket and rubbed and scratched his stomach. Porcillo and his companions concluded that Ponticelli was "whacked out" based upon his behavior. Porcillo testified that, based on his familiarity with Ponticelli's reaction to cocaine, he believed Ponticelli was under the influence of cocaine when he saw him at the convenience store. On cross-examination, Porcillo also recalled seeing a red car at the convenience store when he saw Ponticelli, which he later realized was the Grandinettis's vehicle. Porcillo testified that he knew about

31

how people could act under the influence of crack cocaine because he had a family member who was addicted to that drug.

Ponticelli also presented witnesses to his behavior during his pretrial detention. Ponticelli's former cellmates testified that "they often saw Ponticelli pacing in his cell, at times with a cloth over his head, and constantly reading his Bible and praying." Ponticelli III, 941 So. 2d at 1101. Numerous friends and family members testified that "Ponticelli wrote them long letters from jail that were fragmented and uncharacteristically religious." Id. Trial counsel testified that Ponticelli's "bizarre behavior continued throughout the trial." Id. Ponticelli's sister testified that, although their father had been a religious fundamentalist, she had never known Ponticelli to be one too. Id.

In addition to the lay witness testimony, four mental health experts, Dr. Harry Krop, Dr. Barry Crown, Dr. Michael Herkov, and Dr. Mark Branch, testified on behalf of Ponticelli at the evidentiary hearing. Krop, Herkov, and Branch testified that, in the light of Ponticelli's reported cocaine abuse, both mental health statutory mitigators applied: that is, Ponticelli suffered from an extreme emotional or mental disturbance at time of the murders and Ponticelli's ability to conform his behavior to the requirements of law had been substantially impaired. Krop and Herkov agreed that Ponticelli had not been competent to stand trial. Crown

32

expressed no opinion about Ponticelli's competency to stand trial nor about whether the statutory mental health mitigators applied. He concluded that Ponticelli's brain functioning was impaired and that "his deficits were particularly related to executive functions."

Doctors Crown and Branch conducted only limited research. Crown admitted that he had evaluated Ponticelli seven years after the murders and that he had never been qualified as an expert in neurology in any court of law. He testified that his opinion was based entirely on neuropsychological tests that he had conducted on Ponticelli and that he had not considered other materials or testimony, including testimony about how Ponticelli appeared to exercise executive type reasoning on the night of the murders. Branch, an animal researcher, did not test Ponticelli at all and testified that he was not qualified to testify that Ponticelli suffered from cocaine psychosis.

Crown, Herkov, and Krop made several important concessions about Ponticelli's culpability. Herkov and Krop testified that they could not express an opinion about Ponticelli's sanity at the time of the murders. Crown conceded that Ponticelli had normal intelligence. Herkov and Krop conceded that Ponticelli understood that his acts were wrong. Krop admitted that he believed that Ponticelli "was sufficiently coherent and relatively well organized and knew that

what had happened was a crime and wrong." All three experts acknowledged that Ponticelli's behavior on the night of the murder suggested that he was "goal orientated." Herkov admitted that, even if Ponticelli suffered from an extreme and emotional disturbance at the time of the murders, he could still have formed the heightened premeditation necessary for both the cold, calculated, and premeditated aggravator and the heinous, atrocious, and cruel aggravator to apply. Herkov conceded that Ponticelli's behavior that night "sound[ed] like he . . . [was] very much trying to avoid the consequences of his actions."

Herkov later was recalled as a witness and conceded that there were facts, some of which were unknown to him when he performed his initial evaluation, that cast doubt on his original opinions. These facts included that Ponticelli had assisted his counsel during the trial and that Ponticelli had attempted to dispose of the evidence by drawing Freeman an accurate map. Herkov also admitted that Ponticelli could have been rationally motivated by pecuniary gain.

Dr. Wayne Conger testified, on behalf of the state, that, in his opinion, neither statutory mental health mitigator applied and that Ponticelli had been competent to stand trial. Conger also denied that Ponticelli's brain functions were significantly impaired. Conger testified that Ponticelli was a "normal functioning individual," both intellectually and cognitively. He testified that Ponticelli's

actions before, during, and after he killed the brothers "demonstrated significant, goal-oriented behavior that was inconsistent with significant cognitive dysfunction and with the allegation that Ponticelli's cocaine use prevented him from reasoning effectively." Ponticelli III, 941 So. 2d at 1094. Conger also testified that Ponticelli's strong grades in school "rule[d] out significant organic problems."

Conger conducted many of the same tests as Crown, but reached different conclusions. Conger testified that Crown's results were not valid and that the differences between his results and Crown's results suggested that Ponticelli had malingered when taking Crown's tests. Conger testified that, "even if he were to assume that Crown's tests were accurate, . . . he did not believe the results supported Crown's hypothesis." Ponticelli III, 941 So. 2d at 1094. Dr. Conger also testified about the results of a personality test, which showed that Ponticelli had "the typical profile of an antisocial personality disorder: an individual who does not necessarily comply with the requirements of the law and adventure seeking without any particular concern for rules and regulations."

The trial court rejected Ponticelli's claim of ineffective assistance during the penalty phase of his trial. The trial court found that Ponticelli had failed to establish that he had been prejudiced by trial counsel's failure to offer the lay witness testimony because that evidence was either cumulative of the evidence

presented at trial or "would have had a negative effect on Ponticelli's case" because "[i]nstead of being a young man who naively experimented with drugs for a short period of time, the lay witnesses . . . portray [Ponticelli] as a man who escaped the ill effects of drugs for a substantial period of time in Florida and then returned to a habit he knew was evil." Id. at 1095. About the mental health evidence, the trial court found Dr. Conger's testimony to be the most credible. Id.

The Supreme Court of Florida affirmed. Although the court concluded that Ponticelli had established deficient performance, it ruled that Ponticelli was not prejudiced by his counsel's deficiencies. Id. at 1095–99. The court based its decision on "the significant aggravators and the overwhelming amount of evidence convicting Ponticelli of these homicides":

> A number of witnesses testified at trial that Ponticelli first announced his plan to kill the Grandinettis; then, after following through on this plan, confessed that he did it and asked for help in covering it up. Furthermore, two of the three aggravating factors found for Nick Grandinetti's death, i.e., HAC and CCP, have been recognized as two of the most serious aggravators set out in the statutory sentencing scheme.

Id. at 1097 (internal quotation marks omitted). The court determined that the lay witness testimony was weak and cumulative of the evidence presented at trial:

> The lay witness testimony presented at the evidentiary hearing is certainly not sufficient to establish mitigators that outweigh these aggravators. As the trial court recognized, the testimony presented at the evidentiary hearing was largely cumulative to that presented at trial and to which defense counsel referred in his closing statement during

36

the penalty phase. During the guilt phase, the jury heard a number of witnesses testify to Ponticelli's positive character and the effect of cocaine on his life. Ponticelli's father testified that Ponticelli worked a part-time job during high school and was a "good kid." John Turner, Ponticelli's close friend, testified that he was with Ponticelli every day after Ponticelli returned from his visit to New York and that Ponticelli used cocaine almost constantly during this time. Turner and Ponticelli's father also testified to Ponticelli's paranoid behavior when he was under the effects of cocaine, and Brian Burgess testified at trial that Ponticelli was acting nervous on the night he appeared at Dotson's. At the penalty phase, which occurred nine days after the guilt phase ended, defense counsel specifically connected the testimony regarding Ponticelli's paranoid behavior to his cocaine use. Counsel led Dr. Mills to testify that this paranoia was indicative of the mental health mitigators. On numerous occasions, this Court has denied ineffectiveness claims when the evidence presented at the evidentiary hearing was merely cumulative to that presented at trial. . . .

Id.

The Supreme Court of Florida rejected, on three separate grounds, Ponticelli's argument that his trial counsel's failure to discover the mental health evidence had prejudiced him. First, the court reasoned that the mental health evidence was not sufficient to overcome the aggravators because no expert had testified that Ponticelli was retarded or suffered from a major mental illness. Id. at 1098. Second, because there was conflicting testimony about whether the mental health mitigators were established, the court deferred to the finding of the trial court that Dr. Conger was the most credible. Id. Third, the court concluded that

37

the mental health testimony was cumulative of the testimony provided by Dr. Mills at the trial:

> Dr. Mills unequivocally testified at trial that both statutory mental health mitigators applied in Ponticelli's case and that Ponticelli's paranoid behavior was consistent with an extreme cocaine addiction. While Dr. Crown and Dr. Herkov may have presented more compelling testimony at the evidentiary hearing, this is not dispositive. There is no reasonable probability that these experts would have led the trial court to find the mitigating factors at the time of trial. The trial court did not find the mitigators from Dr. Mills' testimony because there was no evidence Ponticelli had used cocaine on the day of the offenses, and none of the evidence presented at the evidentiary hearing to refute this finding was available to counsel at the time of trial, even after a reasonable investigation.

Id. (internal citations omitted).

The Supreme Court of Florida also rejected Ponticelli's claim about his counsel's performance during the pre-trial phase. The court concluded that Ponticelli's argument that "counsel was ineffective for waiting until a month before trial to file his motion for psychiatric evaluation and for failing to obtain jail records and to interview cellmates who would have provided additional information regarding Ponticelli's strange behavior" was "without merit." Id. at 1102. The court reasoned that Ponticelli had failed to provide "evidence that it was unreasonable for defense counsel to file his motion for a psychiatric evaluation a month before trial; in fact, counsel testified that he filed this motion as soon as he noticed Ponticelli consistently refusing to speak with him about the

38

case." Id. The court determined that not one of the mental health experts who had testified at the evidentiary hearing had testified that they believed that the mental health evaluations during the competency hearing were inadequate. The court reasoned too that Ponticelli's former cellmates did not reveal "anything significant that the experts did not know when they evaluated Ponticelli." Id.

*F. Successive Postconviction Motion and Second Evidentiary Hearing*

At a second evidentiary hearing, Ponticelli presented more evidence of the alleged deal with Freeman and about the cocaine party. The evidence about the alleged deal included several letters that suggested Freeman sought gain time for his testimony in the Ponticelli trial and that Freeman's wife "was told of promises made to Freeman by the [State Attorney's Office] to reduce his sentence that had not been fulfilled." Ponticelli also presented evidence that, on the day of Freeman's deposition, Freeman received 33 days of meritorious gain time and that he was released from prison soon after he testified against Ponticelli. The evidence about the cocaine party included the testimony of Warren Brown, who confirmed that, contrary to his trial testimony, he had met Ponticelli on Thanksgiving night and had smoked cocaine with him that night.

Again, the Supreme Court of Florida rejected Ponticelli's Brady and Giglio claims. The court stated that, "for the same reasons explained in our previous

opinion, Ponticelli has failed to meet the prejudice prong under <u>Brady</u> or the materiality prong under <u>Giglio</u>." <u>Ponticelli v. State</u>, no. SC09–992, 49 So. 3d 236, <u>available</u> <u>at</u> 2010 WL 4628968, at *1 (Fla. Nov. 10, 2010 (unpublished table opinion)). That summary order concluded Ponticelli's proceedings in the state courts.

## G. Federal Habeas Corpus Proceedings

Ponticelli filed a federal petition for a writ of habeas corpus while his successive postconviction motion was pending in the state trial court, and the district court later denied relief. The district court ruled that the Supreme of Court of Florida reasonably applied clearly established federal law when it rejected the claims presented in this appeal. With respect to the claim of ineffective assistance of counsel, the court ruled that "<u>Porter v. McCollum</u>, ---U.S.---, 130 S. Ct. 447 (2009)[,] and <u>Sears v. Upton</u>,---U.S.---, 130 S. Ct. 3259 (2010), are distinguishable and do not announce any new rules of constitutional interpretation; they merely apply <u>Strickland</u> to different sets of facts." The district court granted a certificate of appealability with respect to Ponticelli's <u>Brady</u> and <u>Giglio</u> claims and his claim that counsel had rendered ineffective assistance during the penalty phase of his trial. A judge of this Court expanded the certificate to include Ponticelli's claim

that counsel had been ineffective in his preparation of evidence of Ponticelli's competence to proceed to trial.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 governs Ponticelli's petition and our review of the decisions of the Supreme Court of Florida that denied him postconviction relief. 28 U.S.C. § 2254(d). We will not disturb the decision of the state court unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The Supreme Court of the United States has held that § 2254(d)(1) imposes a 'highly deferential standard for evaluating state-court rulings,' a standard 'which demands that state-court decisions be given the benefit of the doubt.'" Rutherford v. Crosby, 385 F.3d 1300, 1306–07 (11th Cir. 2004) (quoting Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002)) (internal citation omitted). "A state court decision involves an unreasonable application of federal law when it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case," Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170,

41

1178 (11th Cir. 2010) (internal quotation marks omitted), or when it "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context," Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

To determine whether the state court unreasonably applied clearly established federal law in adjudicating Ponticelli's habeas petition, this Court must conduct the two-step analysis that the Supreme Court set forth in Harrington v. Richter, --- U.S. ----, 131 S. Ct. 770 (2011). First, this Court "must determine what arguments or theories supported or, [if none were stated], could have supported the state court's decision." Johnson v. Sec., Dept. of Corr., 643 F.3d 907, 910 (11th Cir. 2011) (quoting Harrington, 131 S. Ct. at 786) (alteration in original) (internal quotation marks omitted). Second, this Court "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. (alteration in original) (internal quotation marks omitted). In other words, we may issue a writ of habeas corpus only when "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87.

42

"The question whether a state court errs in determining the facts is a different question from whether it errs in applying the law." Rice v. Collins, 546 U.S. 333, 342, 126 S. Ct. 969, 976 (2006). "Our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." Stephens v. Hall, 407 F.3d 1195, 1201 (11th Cir. 2005). We presume findings of fact to be correct, and Ponticelli bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. DISCUSSION

This discussion is divided into two parts. Part A addresses Ponticelli's argument that the Supreme Court of Florida unreasonably applied clearly established federal law or unreasonably determined facts when it denied Ponticelli's Brady and Giglio claims. Part B addresses Ponticelli's argument that the Supreme Court of Florida unreasonably applied Strickland when it ruled that trial counsel's investigation of Ponticelli's competence to proceed to trial did not constitute deficient performance and that Ponticelli was not prejudiced by his lawyer's investigation and presentation of evidence in mitigation during the penalty phase.

*A. The Supreme Court of Florida Reasonably Applied* Brady *and* Giglio *and Reasonably Determined the Underlying Facts.*

Ponticelli argues that the rejection of the Supreme Court of Florida of his Brady and Giglio claims involved an unreasonable application of clearly established federal law or an unreasonable determination of the underlying facts. To obtain relief on his Brady claim, Ponticelli had to "establish (1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material." Lamarca v. Sec'y, Dep't of Corr., 568 F.3d 929, 941 (11th Cir. 2009) (internal quotation marks omitted). "Evidence would be 'material' if it is reasonably probable that a different outcome would have resulted if the government had disclosed the evidence. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ferguson v. Sec'y for the Dep't of Corr., 580 F.3d 1183, 1205–06 (11th Cir. 2009) (some internal quotation marks and citation omitted). To obtain relief on his Giglio claim, Ponticelli had to "prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." Trepal v. Sec'y, Fla. Dep't of Corr., no. 10-15306, 2012 WL 2308155, at *17 (11th Cir. June 19, 2012) (internal quotation marks omitted).

"The Giglio materiality standard is different and more defense-friendly than the Brady materiality standard." Id. at *18 (internal quotation marks omitted). "[F]or Brady violations, the defendant must show a reasonable probability the result would have been different, but for Giglio violations, the defendant has the lighter burden of showing that there is any reasonable likelihood that the false testimony could have affected the jury's judgment." Id.

The discussion of these claims is divided into two parts. Part one addresses Ponticelli's argument that his due process rights, under Brady, were violated when the prosecution suppressed evidence of an alleged deal with Freeman and of Ponticelli's cocaine use on the night of the murders and attendance at a cocaine party on Thanksgiving Day. See Brady, 373 U.S. at 87, 83 S. Ct. at 1196–97. Part two addresses Ponticelli's argument that his due process rights, under Giglio, were violated when the prosecution failed to correct Freeman's testimony that he received no benefit in exchange for his testimony against Ponticelli, Keesee's testimony that he did not see Ponticelli use cocaine at the Grandinettis's trailer on the night of the murders, and the testimony of Burgess and Brown that they had not met Ponticelli before the night of the murders. See Giglio, 405 U.S. at 153–54, 92 S. Ct. at 765–66.

1. The Supreme Court of Florida Reasonably Applied Brady and Reasonably Determined the Facts.

45

Ponticelli argues that the Supreme Court of Florida unreasonably applied Brady and unreasonably determined the underlying facts, but that argument fails. With respect to the alleged deal between the prosecution and Freeman, the state supreme court considered the evidence of an alleged deal under the correct standard for materiality, Ponticelli III, 941 So. 2d at 1085 (considering why the alleged suppression did "not rise to the level necessary to put the whole case in such a different light as to undermine our confidence in the verdict"), and reasoned that Freeman had already been substantially impeached on his "motive for testifying and his capacity for truthfulness" because the jury heard that Freeman had worked undercover for the police on multiple occasions; had received cash in exchange for his cooperation on at least one occasion; and had admitted that each of his twenty-six previous felony convictions involved crimes of dishonesty. Id. The court also reasoned that multiple witnesses as well as the map Ponticelli provided to Freeman corroborated his testimony. Id. at 1085–86. It cannot be said that this ruling about materiality "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87. With respect to evidence about Ponticelli's use of cocaine on the night of the murders and attendance at the cocaine party on Thanksgiving night, the Supreme

46

Court of Florida deferred to the finding of the trial court that the state did not knowingly suppress this evidence. Ponticelli failed to satisfy his burden of rebutting, by clear and convincing evidence, this factual determination. See 28 U.S.C. § 2254(e)(1). The Supreme Court of Florida was entitled to credit the testimony of the prosecutor, Williams, who denied knowing that Ponticelli had used cocaine on the night of the murders or had attended a cocaine party the day before the murders. Some of the evidence about these issues, such as Munster's report and Turner's testimony, was provided to Ponticelli's counsel, and the remaining evidence, such as Munster's and William's cryptic notes, is neither clear nor convincing.

Ponticelli argues that the Supreme Court of Florida reviewed his Brady claim too "narrowly" and "ignored much of the evidence presented at the postcoviction hearing," but "to merit AEDPA deference the state court need not . . . provide a detailed opinion covering each aspect of the petitioner's argument." Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 748 (11th Cir. 2010). That the Supreme Court of Florida did not explicitly discuss every piece of evidence is of no moment because we must presume "that state courts know and follow the law," and "state court decisions [must] be given the benefit of the doubt." Visciotti, 537 U.S. at 24, 123 S. Ct. at 360. "[F]ederal habeas corpus is a 'guard against extreme

47

malfunctions in the state criminal justice systems,' not a license to penalize a state court for its opinion-writing technique." Lafler v. Cooper, --- U.S. ---, 132 S. Ct. 1376, 1396 (2012) (Scalia, J., dissenting) (quoting Harrington, 131 S. Ct. at 786). And Allen v. Secretary, Florida Department of Corrections forecloses Ponticelli's argument that the "piecemeal" analysis of the court suggests that it did not follow the correct standard for materiality. See 611 F.3d at 749. In Allen, we reasoned that the "existence of item-by-item analysis . . . is not inconsistent with a cumulative analysis. Indeed, the only way to evaluate the cumulative effect is to first examine each piece standing alone." Id. at 749 (internal quotation marks omitted); see also Kyles v. Whitley, 514 U.S. 419, 436 n.10, 115 S. Ct. 1555, 1567 n.10 (1995) ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect . . . separately."). Ponticelli cannot overcome the presumption that the Florida state court assessed prejudice cumulatively. See Visciotti, 537 U.S. at 24, 123 S. Ct. at 360; see also Greene v. Upton, 644 F.3d 1145, 1159–60 (11th Cir. 2011) ("Greene raised a claim on direct appeal about the cumulative effect of the prosecutor's allegedly prejudicial statements, and the Supreme Court of Georgia rejected it. . . . Although Greene contends that the Supreme Court of Georgia failed even to consider his claim of cumulative prejudicial effect, we must presume otherwise.").

48

## 2. The Supreme Court of Florida Reasonably Applied Giglio and Reasonably Determined the Facts.

Ponticelli argues that the Supreme Court of Florida unreasonably applied Giglio and unreasonably determined the underlying facts of his Giglio claim, but this argument too fails. With respect to the alleged Freeman deal, the Supreme Court of Florida reasoned that any suppression was immaterial because Freeman had already been substantially impeached and numerous witnesses as well as physical evidence corroborated Freeman's testimony. It cannot be said that this decision, even under the more defense-friendly standard of Giglio, "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87. With respect to Keesee's false testimony and the evidence about Ponticelli's attendance at the cocaine party, the trial court found and the state supreme court affirmed that the prosecution did not knowingly present false testimony, and Ponticelli failed to satisfy his burden of rebutting, by clear and convincing evidence, these factual determinations. See 28 U.S.C. § 2254(e)(1).

### B. The Supreme Court of Florida Reasonably Applied Strickland.

Because Ponticelli argues that his trial counsel rendered ineffective assistance of counsel, Ponticelli must establish both that trial counsel's

49

"performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); see also Strickland, 466 U.S. 668, 104 S. Ct. 2052. Deficient performance occurs when "counsel's representation [falls] below an objective standard of reasonableness . . . under prevailing professional norms." Wiggins, 539 U.S. at 521, 123 S. Ct. at 2535 (internal quotation marks and citation omitted). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." Id. at 687, 104 S. Ct. at 2064. The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In the context of a challenge to a sentence of death, the question is whether "there is a reasonable probability that [the judge and jury] would have returned with a different sentence." Wiggins, 539 U.S. at 536, 123 S. Ct. at 2543. "To assess that probability, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and

reweig[h] it against the evidence in aggravation." Porter, 130 S. Ct. at 453–54 (internal quotation marks omitted) (alteration in original). "The likelihood of a different result must be substantial, not just conceivable." Harrington, 131 S. Ct. at 792.

Because "[t]he standards created by Strickland and § 2254(d) are both highly deferential," it follows that "when the two apply in tandem, review is doubly so." Harrington, 131 S. Ct. at 788 (internal quotation marks and citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

This discussion is divided into two parts. Part one addresses Ponticelli's argument that trial counsel rendered deficient performance when he investigated Ponticelli's competence to proceed to trial. Part two addresses Ponticelli's argument that trial counsel's deficiencies during the penalty phase were prejudicial.

1. The Supreme Court of Florida Reasonably Applied Clearly Established Federal Law When it Ruled that Ponticelli's Trial Counsel Did Not Render Deficient Performance Before and During the Competency Hearing.

Ponticelli advances four arguments about why the Supreme Court of

Florida unreasonably applied clearly established federal law when it ruled that Ponticelli's trial counsel did not render deficient performance before and during the competency hearing. First, Ponticelli argues that trial counsel should not have waited until a month before the trial to file a motion for a psychiatric evaluation. Second, Ponticelli argues that trial counsel had a duty to alert the court about incidents of Ponticelli's strange behavior. Third, Ponticelli argues that trial counsel had a duty to interview Ponticelli's cellmates and family members about his mental health. Fourth, Ponticelli argues that trial counsel had a duty to provide Dr. Krop with material about Ponticelli's background.

The ruling of the Supreme Court of Florida—that trial counsel did not render deficient performance—is a reasonable application of Strickland. The Supreme Court of Florida concluded that trial counsel's timing of the competency motion was reasonable because he filed that motion as soon as he noticed that Ponticelli consistently had refused to assist in his defense. And the court concluded that the mental health experts had adequate time to evaluate Ponticelli. Ponticelli III, 941 So. 2d at 1102. About Ponticelli's other allegations of deficiencies, the court held that "Ponticelli has not presented sufficient evidence to overcome the strong presumption that counsel's representation was reasonable." Id. It cannot be said that the decision of the Supreme Court of Florida "was so

52

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," Harrington, 131 S. Ct. at 786–87, especially because "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments," Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.

Even if trial counsel had been deficient, it was reasonable to conclude that Ponticelli suffered no prejudice. Although Dr. Krop testified at the evidentiary hearing that he later believed there was sufficient evidence to conclude Ponticelli was incompetent to proceed at the time of trial, Dr. Krop did not believe that his pretrial evaluation, in which he concluded that Ponticelli was competent, had been inadequate. Ponticelli III, 941 So. 2d at 1099–1100. Dr. Krop was the only expert who testified at the postconviction hearing who also testified and examined Ponticelli for his pretrial competency hearing. Id. at 1099–1101. And Dr. Conger testified that Ponticelli was competent to stand trial. Id. at 1100–01.

2. The Supreme Court of Florida Reasonably Applied Clearly Established Federal Law When it Ruled that Trial Counsel's Deficient Performance During the Penalty Phase Was Not Prejudicial, and Ponticelli's Claim Fails Alternatively on De Novo Review.

53

Ponticelli argues that the conclusion of the Supreme Court of Florida—that trial counsel was deficient during the penalty phase, but the deficiencies were not prejudicial—is an unreasonable application of clearly established federal law for two reasons. First, Ponticelli argues that the decision is objectively unreasonable. Second, he argues that the decision cannot be squared with Porter and Sears. Because the State of Florida does not contest the decision that trial counsel was deficient, there is no need to express an opinion about that issue. But Ponticelli's arguments about prejudice fail.

The decision of the Supreme Court of Florida to reject Ponticelli's Strickland claim is objectively reasonable. The court correctly identified Strickland as the governing Supreme Court principle and reasoned that the evidence would have had a negative effect on Ponticelli's appeal, was cumulative of the testimony presented at trial, and was too weak to overcome the strong aggravators. Ponticelli III, 941 So. 2d at 1095–98. Both the Supreme Court and this Court have consistently held that it is reasonable for a state court to conclude that a petitioner suffers no prejudice when the evidence is either weak or cumulative of the testimony presented at trial. See, e.g., Cullen v. Pinholster, ----U.S. ----, 131 S. Ct. 1388, 1409–10 (2011); Wong v. Belmontes, 558 U.S. ----, 130 S. Ct. 383, 387 (2009); Rose v. McNeil, 634 F.3d 1224, 1243 (11th Cir. 2011);

54

Rhode v. Hall, 582 F.3d 1273, 1287 (11th Cir. 2009). And both the Supreme Court and this Court have consistently "rejected [the] prejudice argument[] where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence." Cummings v. Sec'y for the Dep't of Corr., 588 F.3d 1331, 1367 (11th Cir. 2009) (internal quotation marks omitted); see also, e.g., Cullen, 131 S. Ct. at 1409–10; Belmontes, 130 S. Ct. at 387–88; Rose, 634 F.3d at 1242–46; DeYoung v. Schofield, 609 F.3d 1260, 1290–91 (11th Cir. 2010); Suggs v. McNeil, 609 F.3d 1218, 1229–32 (11th Cir. 2010); Reed v. Sec'y, Fla. Dep't. of Corr., 593 F.3d 1217, 1245 (11th Cir. 2010); Cummings, 588 F.3d at 1365–69; Gaskin v. Sec'y, Dep't of Corr., 494 F.3d 997, 1003–04 (11th Cir. 2007); Robinson v. Moore, 300 F.3d 1320, 1345–52 (11th Cir. 2002); Grayson v. Thompson, 257 F.3d 1194, 1225–30 (11th Cir. 2001). In the light of those precedents, it cannot be said that the decision of the Supreme Court of Florida to reject Ponticelli's Strickland claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," Harrington, 131 S. Ct. at 786–87.

Ponticelli argues that the conclusion of the state court that the mental health testimony was cumulative to Dr. Mills's testimony is objectively unreasonable. Ponticelli contends that the Supreme Court of Florida, on direct appeal, rejected

55

Dr. Mills's testimony because there was no evidence about Ponticelli's cocaine use on the night of the murders. He argues that a jury would have been more likely to accept Dr. Mills's conclusions based on the new evidence that he used cocaine on the night of the murders.

Ponticelli's argument fails for two reasons. First, the state court rejected Dr. Mills's conclusions, not only because of the lack of evidence related to drug use, but because Ponticelli's actions on the night of the murder strongly suggested that he was in control of his actions. Second, Dr. Mills's testified at trial that the statutory mental health mitigators should apply regardless of whether Ponticelli used cocaine on the night of the murders. Thus, it was reasonable for the state court to conclude that any new mental health testimony that the two statutory mental health mitigators should apply was cumulative to Dr. Mills's testimony.

Ponticelli argues that the conclusion of the Supreme Court of Florida that his mitigation evidence of drug use and mental health problems would have had a negative effect is objectively unreasonable, but that argument fails. Drug abuse "has little mitigating value and can do as much or more harm than good in the eyes of the jury." Crawford v. Head, 311 F.3d 1288, 1321 (11th Cir. 2002); see also, e.g., Suggs, 609 F.3d at 1232 (observing that "evidence of historical drug and alcohol use" is "unfavorable"); Grayson, 257 F.3d at 1227 ("[E]mphasizing

56

[petitioner's] alcoholic youth and intoxication may also have been damaging to [petitioner] in the eyes of the jury."). The Supreme Court of Florida reasonably concluded that evidence of Ponticelli's cocaine abuse would have done more harm than good in the eyes of the jury because "[i]nstead of being a young man who naively experimented with drugs for a short period of time," the jury would have heard that Ponticelli had "escaped the ill effects of drugs for a substantial period of time in Florida and then returned to a habit he knew was evil." Ponticelli III, 941 So. 2d at 1095. Further, Ponticelli's mental health evidence "would have invited the strongest possible evidence in rebuttal." Belmontes, 130 S. Ct. at 389. That is, Dr. Conger would have testified that Ponticelli had the profile of a sociopath, which is "more harmful . . . than mitigating," Reed, 593 F.3d at 1248.

Ponticelli advances three theories to support his contention that the Supreme Court of Florida unreasonably applied Strickland in the light of Porter and Sears. First, Ponticelli argues that the state court did not consider his mental health evidence because it "rejected the mental health mitigation presented in postconviction on the basis that the lower court found the State expert's testimony to be the most credible." Second, Ponticelli argues that the state court unreasonably discounted nonstatutory mitigation evidence. Third, Ponticelli argues that the state court erred in its analysis of prejudice because it considered

the evidence in mitigation "in a piecemeal fashion against the aggravating circumstances." Ponticelli's arguments fail.

Porter decided that it was unreasonable for a state court to conclude that counsel's failure to present powerful mitigation evidence about his client's heroic military service and mental health evidence of brain damage was not prejudicial. Porter, 130 S. Ct. at 453–55. A Florida jury convicted Porter of two counts of first degree murder after he killed his ex-girlfriend and her boyfriend. Id. at 448. The jury at Porter's trial recommended a sentence of death for both murders, but the trial court imposed a sentence of death for the murder of only the ex-girlfriend. Id. at 449. Porter filed a petition for postconviction relief in state court on the ground that his penalty-phase counsel had failed to investigate and present mitigating evidence. Id. The trial court conducted an evidentiary hearing, and Porter presented extensive mitigating evidence about his "(1) . . . heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) . . . struggles to regain normality upon his return from war, (3) . . . childhood history of physical abuse, and (4) . . . brain abnormality, difficulty reading and writing, and limited schooling." Id. at 454.

With regard to the mental health evidence, Porter presented an expert in neuropsychology who had examined Porter and administered psychological tests

to him.  Id. at 451.  Porter's neuropsychologist testified that Porter "suffered from brain damage that could manifest [itself] in impulsive, violent behavior," and that, at the time of the murders, Porter was "substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance."  Id.  Porter's neuropsychologist also testified that Porter "had substantial difficulties with reading, writing, and memory, and that these cognitive defects were present when he was evaluated for competency to stand trial."  Id. Although the experts that the state presented "reached different conclusions regarding the statutory mitigators," each of the state experts "testified that he could not diagnose Porter or rule out a brain abnormality."  Id. (footnote omitted).

With regard to the military service evidence, Porter proved that he enlisted in the United States Army at age 17 and fought in the Korean War.  While serving his country in combat, Porter was shot in the leg.  Id. at 449–50.  After receiving "little or no" food or sleep for five days, he was forced to "engage[] in a fierce hand-to-hand fight with the Chinese."  Id. at 450 (internal quotation marks omitted).  After another "very trying, horrifying" battle, Porter "individually received two Purple Hearts and the Combat Infantryman Badge, along with other decorations."  Id. (internal quotation marks omitted).  Porter went absent without leave on two occasions while in Korea, but his company commander testified that

"this was not uncommon, as soldiers sometimes became disoriented and separated from the unit." Id. Porter was eventually honorably discharged, and, "[a]fter his discharge, he suffered dreadful nightmares and would attempt to climb his bedroom walls with knives at night." Id.

The trial court ruled that Porter had not been prejudiced by the failure to introduce any of the mental health or military service mitigation evidence, and the Supreme Court of Florida affirmed. Id. at 451. The Supreme Court of Florida explicitly refused to consider Porter's proposed mental health evidence for statutory mitigation purposes because the state expert disagreed with the conclusions of Porter's expert and the trial court had accepted the conclusions of the state expert. Porter v. State, 788 So. 2d 917, 923 (2001). And the Supreme Court of Florida agreed with the trial court that "Porter's periods of being AWOL would have reduced the impact of Porter's military service to inconsequential proportions." Porter, 130 S. Ct. at 451 (internal quotation marks omitted). It "held the trial court was correct to find the additional nonstatutory mitigation to be lacking in weight because of the specific facts presented." Id.

The Supreme Court of the United States ruled that the Supreme Court of Florida had unreasonably applied clearly established federal law because it "either did not consider or unreasonably discounted the mitigation evidence [that Porter]

60

adduced in the postconviction hearing." Id. at 454. The Court ruled that it was unreasonable for the Supreme Court of Florida to "discount entirely" the impact that the testimony of Porter's mental health expert might have had on the sentencing judge and jury. Id. at 455. The Court also held that the state court unreasonably considered the evidence of Porter's military history in a way that was contrary to "a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did." Id. The Court reasoned that, "the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter." Id. In other words, "[t]he evidence that he was AWOL is consistent with this theory of mitigation and does not impeach or diminish the evidence of his service." Id.

Porter does not compel the conclusion that the Supreme Court of Florida, in this appeal, failed to consider the mental health evidence for either statutory or non-statutory mitigation purposes. To be sure, the Supreme Court of Florida in Ponticelli's appeal, as in Porter, stated that it would "defer to the trial court's finding of fact when faced with conflicting expert testimony," Ponticelli III, 941 So. 2d at 1098, but unlike what occurred in Porter, the Supreme Court of Florida

61

also considered the effect of the conflicting testimony and concluded that the mental health evidence was both too weak to overcome the aggravators and cumulative of that heard by the jury during the trial. Id. In other words, the Supreme Court of Florida in this appeal, unlike in Porter, did not "discount entirely" Ponticelli's mitigation evidence. Cf. Porter, 130 S. Ct. at 445. That the Supreme Court of Florida "determined what impact, if any, that mitigating evidence . . . would have had on the trial court when weighed against the aggravating evidence" distinguishes this appeal from Porter. Cf. Sochor v. Sec'y Dep't. of Corr., no. 10-14944, slip op. at 31–32 (11th Cir. June 27, 2012).

Nor does Porter compel the conclusion that state courts may not consider harmful aspects of proposed mitigation evidence. Porter is an application of Strickland. Porter does not alter the ordinary rule that courts "must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

Ponticelli's reliance on Sears fares no better for three reasons. First, unlike the state court decision involved in this appeal, the decision in Sears was not subject to deferential review under section 2254(d) because the defendant in Sears had not filed a federal petition for a writ of habeas corpus. The defendant instead had petitioned the Supreme Court of the United States to review the decision of

62

the Supreme Court of Georgia on state collateral review. 130 S. Ct at 3261 & n.1. Second, unlike this appeal, the state court in Sears had expressly refused to consider the test for prejudice under Strickland because it had concluded that the task was "impossible." Id. at 3264–65 & n.9. Third, the Supreme Court in Sears did not hold that double-edged sword evidence, like Sears's life of crime, was necessarily evidence in mitigation. Instead, the Court reasoned that "the fact that Sears' brother . . . introduced Sears to a life of crime . . . would have been consistent with a mitigation theory portraying Sears as an individual with diminished judgement and reasoning skills . . . ." Id. at 3263. That Sears's brother introduced him to a life of crime would have also been consistent with the testimony of Sears's experts that he performed at or below the bottom first percentile—the lowest first percent—in several measures of cognitive functioning and reasoning. Id. at 3261. Because the Court considered Sears's claim de novo, it expressed no opinion about whether state courts apply clearly established law unreasonably when they consider how double-edged sword evidence could undermine a theory of mitigation either generally or in a specific decision.

Nor do Sears and Porter compel the conclusion that the Supreme Court of Florida applied the prejudice test in a manner that was contrary to clearly established federal law. Ponticelli's argument that the state court failed to

63

consider the totality of the available mitigation evidence and reweigh it against the evidence in aggravation fails. That the court organized its discussion of the evidence in a piecemeal fashion is of no moment. As explained above, "[t]he existence of item-by-item analysis . . . is not inconsistent with a cumulative analysis." Allen, 611 F.3d at 749. Ponticelli cannot overcome the presumption that the Supreme Court of Florida assessed prejudice cumulatively. See Visciotti, 537 U.S. at 24, 123 S. Ct. at 360; Greene, 644 F.3d at 1159–60.

"Even if [Ponticelli's] ineffective-assistance-of-counsel claim were eligible for de novo review, it would still fail." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420 (2009). "The Supreme Court has made clear that we are entitled to affirm the denial of habeas relief in this manner: 'a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review.'" Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1291 (11th Cir. 2012) (quoting Berghuis v. Thompkins, ---U.S.---, 130 S. Ct. 2250, 2265 (2010)); see also Sochor, no. 10-14944, slip op. at 32. "[W]e have employed this approach even when it was clear that the deference afforded by section 2254(d) applied." Reese, 675 F.3d at 1291; see, e.g., Allen, 611 F.3d at 753.

Ponticelli cannot establish that he suffered prejudice because there is not a "reasonable probability" that the jury would have not recommended a sentence of

64

death absent any errors. See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "To assess that probability, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation," Porter, 130 S. Ct. at 453–54 (internal quotation marks omitted) (alteration in original), and the Supreme Court has instructed that we should "turn first to the aggravating and mitigating evidence that the sentencing jury considered." Cullen, 131 S. Ct. at 1408.

As in Cullen, "[t]he State presented extensive aggravating evidence." Id. The state proved that three statutory aggravators applied to Nick Grandinetti's death: Ponticelli committed the murder for pecuniary gain, Fla. Stat. § 921.141(5)(f); Ponticelli committed the murder in a "cold, calculated, and premeditated manner without any pretense of moral or legal justification," id. § 921.141(5)(i); and the murder was "especially heinous, atrocious, [and] cruel," id. § 921.141(5)(h). In Florida, "the heinous, atrocious, or cruel [and] the cold, calculated, and premeditated aggravators . . . are two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999). "[T]he Supreme Court has expressly cautioned against comparing aggravating circumstances based on their sheer number, but rather, has

suggested that we focus on their weight." Boyd v. Allen, 592 F.3d 1274, 1302 n.7 (11th Cir. 2010).

The evidence proffered at the evidentiary hearing does not undermine the application of these aggravators. Although trial counsel testified that he would not have conceded the existence of the cold, calculated, and premeditated aggravator, Ponticelli's own expert, Dr. Herkov, testified that, even if Ponticelli had suffered an extreme and emotional disturbance at the time of the murders, Ponticelli could have formed the necessary intent for either of the statutory aggravators to apply. Herkov also conceded that the opportunity for pecuniary gain could have motivated Ponticelli to kill.

Ponticelli presented a theory of cocaine psychosis as mitigating evidence during the penalty phase of his trial. The jury heard about Ponticelli's severe addiction to cocaine through the testimony of both Turner and Ponticelli's father. Meade and Leonard testified that Ponticelli was a reliable person and a good friend when he did not abuse cocaine. Dr. Mills also testified that the two statutory mental health mitigators should apply regardless of whether Ponticelli used cocaine on the night of the murders. Despite this evidence, the court found only two statutory mitigators—Ponticelli had no significant history of previous criminal activity, Fla. Stat. § 921.141(6)(a), and Ponticelli was 20 years old at the

time of the offense, id. § 921.141(6)(g).  The court rejected the mental health statutory mitigators, see id. § 921.141(6)(b), (f), and found no nonstatutory mitigators.

Ponticelli relied on the same mitigation theory during collateral review, and it is unlikely that a jury or sentencing court would have found his improved version of a cocaine psychosis more persuasive the second time around for two reasons.  First, the expert testimony was cumulative to Dr. Mills's testimony, and it is "highly improbable that a jury, which had just rejected testimony about [Ponticelli's] mental condition when the State bore the burden of proof, would have reached a different result" when Ponticelli carried the burden of proof at the evidentiary hearing.  Knowles,  556 U.S. at 128, 129 S. Ct. at 1422.  Second, the trial court refused to apply one of the mental health mitigators, in part, because Ponticelli's behavior on the night of the murder suggested that he was in control of his actions.  None of the evidence presented during the evidentiary hearing undermined that conclusion.

If anything, substantial evidence unearthed during the evidentiary hearing contradicted Ponticelli's psychosis theory.  Each expert testified that Ponticelli's behavior was "goal oriented."  At trial, Ponticelli's trial counsel argued that Ponticelli was unstable because he had asked Dotson and his friends for help even

though he had met them only four hours earlier, but at the evidentiary hearing, Ponticelli presented evidence that he had met Dotson and his friends the day before the murders and had even smoked cocaine with them. A jury would have been less likely to conclude that Ponticelli was unstable in the light of this evidence.

The presentation of Ponticelli's other mitigation evidence—that Ponticelli was a poly-substance abuser with brain damage and that Porcillo believed Ponticelli was high on the night of the murders—was fraught with peril for at least three reasons. First, in response to the evidence about brain damage, the state could have elicited testimony from Dr. Conger that Ponticelli had the profile of a sociopath. As we have held consistently, "[t]his evidence is potentially aggravating as it suggests that [Ponticelli] has antisocial personality disorder, which is a trait most jurors tend to look disfavorably upon, that is not mitigating but damaging[.]" Suggs, 609 F.3d at 1231 (internal quotation marks and citation omitted). Second, Porcillo's testimony "would have come at a steep price." Id. The state could have elicited testimony that Ponticelli had a history of drug abuse, but had quit on one occasion for an extended period of time, only to "return[] to a habit he knew was evil." Ponticelli III, 941 So. 2d at 1095. This evidence, alone and in combination with the evidence that Ponticelli smoked cocaine before he

murdered the Grandinetti brothers, likely could have caused some jurors to vote in favor of death.  See Suggs, 609 F.3d at 1231.  Third, although Ponticelli's brain damage is relevant to the extent that it suggests that he has some cognitive deficiencies and is less morally culpable for his actions, Ponticelli's behavior before, during, and after the murders suggests that he was in control of his actions.

The evidence of Ponticelli's premeditation was powerful.  Before he committed the murders, Ponticelli borrowed a gun; told his friends that he planned to kill two people for cocaine and money; and created and executed a plan to lure the victims from their home.  Ponticelli drove the victims to back roads to avoid detection, shot them both in the head, and when he heard Nick moan, battered Nick with the butt of his gun.  After the murder, Ponticelli took cocaine and money from the bodies; returned the gun and told his friend to dispose of the weapon; abandoned the car because of a flat tire and called a taxi cab; cleaned the blood off his clothes and later burned those clothes; asked for an alibi; bragged to several friends that he had killed two men for cocaine and money; asked Brown and Burgess to drive around the block a few times after the murder because he was afraid of the police; planned to leave the country to evade authorities; told Dotson he planned to fix up a "getaway car"; and asked Freeman to help him dispose of the evidence, and even drew a map with the location of that evidence.

69

All that remains of Ponticelli's mitigation evidence is that he had some difficulties at birth, that he was socially-awkward, that he was adopted by foster parents, and that neighborhood kids ridiculed his weight and glasses. In other words, Ponticelli experienced a childhood like that of thousands of children in America who do not grow up to commit premeditated double murders. This evidence of mitigation is of negligible weight.

Ponticelli is not entitled to relief. A reweighing of the evidence leads to the conclusion that "[t]here is no reasonable probability that the additional evidence [Ponticelli] presented in his state habeas proceedings would have changed the jury's verdict." Cullen, 131 S. Ct. at 1409. Even if Ponticelli were entitled to de novo review of his Strickland claim, he would not be entitled to the writ of habeas corpus.

## IV. CONCLUSION

The denial of Ponticelli's petition for a writ of habeas corpus is **AFFIRMED**.

EDMONDSON, Circuit Judge, concurring in the result:

I reach the same result as Judge Pryor has done: affirm the district court's decision to deny habeas relief.

In my view, given the deferential standard commanded by AEDPA, no relief can be correctly given by us in this case. The pertinent state decision reasonably determined the facts and neither contradicted nor unreasonably applied the then clearly established federal law, in the light of the actual holdings made by the decisions of the Supreme Court of the United States—even considering later decisions (such as, the decision for prejudice in the <u>Porter</u> case). I believe the lack of prejudice, right through, is a particularly strong point for Florida—given the evidence in this case and the deference required by AEDPA.

MARTIN, Circuit Judge, concurring in the judgment in part and dissenting in part:

I would reverse the District Court's denial of Mr. Ponticelli's claim that he received ineffective assistance of counsel during the sentencing phase of his capital trial. In my judgment, the Florida Supreme Court's decision rejecting this claim was an unreasonable application of the prejudice analysis required by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Once the state court unreasonably applies Strickland, its analysis is not entitled to deference under 28 U.S.C. § 2254(d). Having conducted a de novo review, I conclude that Mr. Ponticelli has demonstrated "there is a reasonable probability that, absent [counsel's deficient performance], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

Judge Pryor's opinion accepts the Florida Supreme Court's holding that Mr. Ponticelli's trial counsel's investigation for and presentation of the penalty phase of the trial were deficient. And it bears noting that the state court record fully and clearly supports the conclusion that counsel's performance was constitutionally deficient. As the Florida Supreme Court explained:

> [C]ounsel's penalty phase investigation consisted of interviewing Ponticelli's parents and asking Dr. Mills to testify. Counsel apparently failed to contact the persons suggested by Ponticelli's parents, made no effort to obtain any of Ponticelli's school or medical records, and did not

72

request that Dr. Mills evaluate Ponticelli again before testifying at the penalty phase. While we recognize that a mental health evaluation is not required in every case, the record shows that Dr. Mills'[s] penalty phase testimony was based on the fifteen-minute evaluation he conducted on Ponticelli before the competency hearing and his review of the record. . . .

Counsel's stated reason for not investigating this potential mitigation was that he did not know how to conduct a penalty phase. Inexperience is not an excuse for deficient performance. . . . Defense counsel's failure to conduct an adequate investigation resulted in a deficient penalty phase presentation. He presented only one witness at the penalty phase and asked this witness to base his testimony on a hypothetical that was not entirely accurate. We agree with Ponticelli that counsel's penalty phase investigation and presentation were deficient.

Ponticelli v. State, 941 So. 2d at 1073, 1095–96 (Fla. 2006) (Ponticelli III) (footnotes and citations omitted). This conclusion was compelled by what was then, and continues to be, clearly established federal law. See Williams v. Taylor, 529 U.S. 362, 368–70, 395–96, 120 S. Ct. 1495, 1500–01, 1514–15 (2000) (finding counsel performed deficiently by failing to conduct constitutionally adequate penalty phase investigation in 1986 trial); see also Porter v. McCollum, ___ U.S. ___, ___, 130 S. Ct. 447, 448–49, 452–53 (2009) (same as to 1988 trial); Rompilla v. Beard, 545 U.S. 374, 381–90, 129 S. Ct. 2456, 2462–67 (2005) (same).

Proceeding from the finding regarding trial counsel's deficient performance, Strickland requires an analysis of whether Mr. Ponticelli was prejudiced by this

73

deficiency. And on the issue of whether the Florida Supreme Court's adjudication of Strickland's prejudice prong involved an unreasonable application of federal law, I have arrived at a conclusion different from that of my colleagues. My conclusion is that the Florida Supreme Court unreasonably applied Strickland within the meaning of § 2254(d)(1). The United States Supreme Court's decisions in Williams and Porter compel me to this conclusion in three different ways.

First, the Florida Supreme Court's prejudice analysis under Strickland was an unreasonable application of clearly established federal law for the same reason articulated by the Supreme Court in Williams: the state court "failed to accord appropriate weight to the [whole] body of mitigating evidence [that would have been] available to trial counsel" in its reweighing analysis. 529 U.S. at 398, 120 S. Ct. at 1516. More specifically, in Williams the Supreme Court found the Virginia Supreme Court's "prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." Id. at 397–98, 120 S. Ct. at 1515 (citing Clemons v. Mississippi, 494 U.S. 738, 751–52, 110 S. Ct. 1441, 1450 (1990)). The Supreme Court said the error was "apparent in [the Virginia Supreme Court's] consideration of the additional mitigation evidence developed in the postconviction proceeding."

74

Id. at 398, 120 S. Ct. at 1515. Although the Virginia Supreme Court correctly considered the new evidence adduced in the state postconviction hearing and the strength of the prosecution's evidence of aggravation, it failed to consider the mitigation from the original penalty phase and reweigh it together with the postconviction evidence. Id. This being the case, the United States Supreme Court concluded that the Virginia Supreme Court unreasonably applied Strickland's prejudice analysis when it "failed to accord appropriate weight to the [whole] body of mitigating evidence [that would have been] available to trial counsel." Id.

The Florida Supreme Court committed the same error in Mr. Ponticelli's case. The same as in Williams, the state court here did not evaluate the totality of Mr. Ponticelli's mitigating evidence insofar as its prejudice analysis did not even mention the statutory mitigation that was found to exist at the original trial. See Ponticelli III, 941 So. 2d at 1092–99. During the penalty phase of Mr. Ponticelli's jury trial, the trial court found two statutory mitigating circumstances: (1) he has no significant history of prior criminal activity, see Fla. Stat. § 921.141(6)(a); and (2) he was twenty years old at the time of the offense, see id. § 921.141(6)(g). The Florida Legislature's affirmative inclusion of age and lack of criminal history among its eight statutory mitigating circumstances, see id. § 921.141(6)(a)–(h),

75

together with the sentencing court's finding that these mitigators applied, establish that these aspects of Mr. Ponticelli's background and character are mitigating as a matter of state law. Even if that were not the case, the trial court's findings regarding Mr. Ponticelli's age and lack of criminal history would still be constitutionally relevant mitigating circumstances which, either alone or together, could serve "as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2965 (1978) (plurality opinion); see also Jackson v. State, 599 So. 2d 103, 110 (Fla. 1992) (recognizing defendant's lack of significant history of prior criminal activity, coupled with other mitigation, may clearly serve as a reasonable basis for a jury's life recommendation).[1]

The second way in which I believe there was an unreasonable application of Strickland is because of the piecemeal manner in which the Florida Supreme Court weighed Mr. Ponticelli's postconviction mitigation evidence. This is demonstrated by the state court's opinion which plainly measured the mitigating

---

[1] It is black letter Constitutional law that states must allow judges and juries in capital cases to hear, consider, and give full effect to all relevant mitigating evidence. See Roper v. Simmons, 543 U.S. 551, 568, 125 S. Ct. 1183, 1194 (2005) (defendant must be afforded "wide latitude" to present mitigating evidence); see also Abdul-Kabir v. Quarterman, 550 U.S. 233, 264, 127 S. Ct. 1654, 1675 (2007) (statutory requirements that jury consider only particular kinds of mitigating evidence are unconstitutional); Brewer v. Quarterman, 550 U.S. 286, 289, 127 S. Ct. 1706, 1710 (2007) (sentencer may not be precluded from "giving meaningful effect to mitigating evidence"); Lockett, 438 U.S. at 604, 98 S. Ct. at 2964–65 (plurality opinion) (sentencer cannot be precluded from considering character or circumstances of defendant's record).

evidence presented during the postconviction hearing against the aggravating evidence in a fragmented fashion. See Ponticelli III, 941 So. 2d at 1096–99. The Florida Supreme Court's prejudice analysis grouped the postconviction evidence into two categories: (1) "lay witness testimony," id. at 1097; and (2) "mental health testimony," id. at 1098. The court then weighed each category of evidence separately against the evidence in aggravation. See id. at 1097 ("The lay witness testimony presented at the evidentiary hearing is certainly not sufficient to establish mitigators that outweigh these aggravators."); id. at 1098 ("[N]either Dr. Crown's nor Dr. Herkov's testimony was sufficient to establish mental health mitigation which would, in all reasonable probability, have outweighed the significant aggravators in this case.").

What the Florida Supreme Court was required to do under Williams was consider the lay witness and mental health evidence together, along with the original evidence presented during the penalty phase of the jury trial, then reweigh all of it against all the evidence in aggravation. Again, to properly evaluate Strickland prejudice, reviewing courts must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" Porter, 130 S. Ct. at 453–54 (quoting Williams, 529 U.S. at 397–98, 120 S. Ct. at

77

1515) (emphasis added). By "totality of the available mitigation evidence," the Supreme Court meant the evidence as a whole. See Williams, 529 U.S. at 398–99, 120 S. Ct. at 1516 ("In our judgment, the state trial judge was correct . . . in his conclusion that the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised a reasonable probability that the result of the sentencing proceeding would have been different . . . ." (quotation marks omitted) (emphasis added)). Thus, by using a truncated reweighing analysis even for the mitigating evidence it did consider, the state court unreasonably applied clearly established federal law. See id. at 397–98, 120 S. Ct. at 1515.

Third, the Florida Supreme Court unreasonably applied Strickland when it repeated the same errors in Mr. Ponticelli's case that the Supreme Court condemned in Porter. The Supreme Court explained its reasoning as follows:

> The Florida Supreme Court's decision that Porter was not prejudiced by his counsel's failure to conduct a thorough—or even cursory—investigation is unreasonable. The Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing. Under Florida law, mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating. Indeed, the Constitution requires that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." Yet neither the postconviction trial court nor the Florida Supreme Court gave any consideration for the purpose of nonstatutory mitigation to [the defense expert's] testimony

regarding the existence of a brain abnormality and cognitive defects. While the State's experts identified perceived problems with the tests that [the defense expert] used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.

130 S. Ct. at 454–55 (emphasis added) (footnotes and citations omitted). Here, like in Porter, the Florida Supreme Court either "did not consider or unreasonably discounted" Mr. Ponticelli's constitutionally relevant mitigating evidence. Id. at 454. This is true for both the statutory and the non-statutory mitigation Mr. Ponticelli presented during the postconviction hearing, including: his brain damage; cognitive deficits; drug use at the time of the offense; and statutory mental health mitigating circumstances. See Ponticelli III, 941 So. 2d at 1097–99. By refusing to conclude the Florida Supreme Court's prejudice analysis was not an unreasonable application of Strickland, this Court repeats the same error it committed in Porter v. Attorney General, 552 F.3d 1260, 1272–75 (11th Cir. 2008), when it did not find anything unreasonable about the Florida Supreme Court's decision in Porter v. State, 788 So. 2d 917 (Fla. 2001).

Because the Florida Supreme Court clearly failed to put all of the mitigating evidence from the jury trial penalty phase into the "hopper" with all the mitigation that came to light after Mr. Ponticelli's trial and then reweigh it against the evidence in aggravation, it unreasonably applied Strickland's prejudice analysis.

79

Thus, its adjudication of Mr. Ponticelli's claim of Strickland prejudice at the penalty phase is not entitled to any deference under AEDPA. See Panetti v. Quarterman, 551 U.S. 930, 953, 127 S. Ct. 2842, 2858 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").

In light of the state court's unreasonable application of federal law, Mr. Ponticelli is entitled to de novo review of the record with respect to prejudice under Strickland. See McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1266 (11th Cir. 2009). On this issue, I do not agree with Judge Pryor's conclusion that the evidence presented during the state evidentiary hearing was cumulative to the scant evidence that was presented at trial. My review of the record tells me that the judge and jury during the sentencing of Mr. Ponticelli's trial heard very little evidence supporting his trial counsel's efforts to humanize him or that would allow them to more accurately gauge his moral culpability. Thus, the picture that the judge and the jury would have seen had counsel not been deficient is very different.

During the penalty phase, Mr. Ponticelli's trial counsel presented only the testimony of Dr. Mills, given in the form of a hypothetical. Dr. Mills testified that (1) Mr. Ponticelli's behavior and the changes in his personality shortly before, during, and after the offense were consistent with cocaine addiction; (2) Mr. Ponticelli was suffering from an extreme mental or emotional disturbance because of his repeated cocaine use around the time of the offense, see Fla. Stat. § 921.141(6)(b); and (3) Mr. Ponticelli's capacity to appreciate the criminality of his conduct was substantially impaired, see id. § 921.141(6)(f).

The force of this testimony was significantly limited, however, because of the cursory nature of Dr. Mills's evaluation. Dr. Mills only interviewed Mr. Ponticelli one time for fifteen minutes, and that was before trial and for the limited purpose of a court-ordered competency and sanity evaluation. Trial counsel did not request that Dr. Mills evaluate Mr. Ponticelli again before his penalty phase testimony. Indeed, the Florida Supreme Court emphasized these facts in support of its conclusion that trial counsel was deficient. See Ponticelli III, 941 So. 2d 1095–96 & n.24 (citing Arbelaez v. State, 898 So. 2d 25, 34–35 (Fla. 2005), for the proposition that trial counsel should not have considered Dr. Mills's fifteen-minute interview "a reliable substitute for a thorough mitigation investigation").

81

Further, while trial counsel attempted to integrate some of the evidence presented during the trial into the hypothetical posed to Dr. Mills, because of counsel's constitutionally inadequate investigation into Mr. Ponticelli's background, Dr. Mills testified to a hypothetical that was not factually accurate. As the state court noted, "[trial counsel] asked Dr. Mills to assume that Ponticelli had no history of cocaine abuse until Ponticelli returned from his visit to New York in October 1987. [But] the unrefuted testimony at the evidentiary hearing revealed that Ponticelli was heavily abusing cocaine by the age of sixteen." Ponticelli III, 941 So. 2d at 1096 n.25. The hypothetical was undoubtably wrong about the length and severity of Mr. Ponticelli's drug addiction. Of more pressing concern, however, is that the hypothetical did not reference Mr. Ponticelli's drug use as witnessed on the day of the offense by Tim Keesee, and as also recognized that day by Frank Porcillo. As a result, during penalty phase closing arguments, the prosecutor told the jury that while Mr. Ponticelli used "a lot" of cocaine, "there was no evidence at all during the trial that he had used cocaine [the day of the offense]; none whatsoever."[2]

_____

[2] There was no evidence of Mr. Ponticelli's drug use at the time of the offense in part due to the state's suppression of this evidence. While I agree that Mr. Ponticelli has not demonstrated a Brady or Giglio violation with respect to his convictions, I arrive at my conclusion by a different route than Judge Pryor. In my view, Mr. Ponticelli's Brady and Giglio claims should be denied with regard to his convictions not because he has failed to establish that evidence of his intoxication was suppressed, but because he has not demonstrated prejudice as to

At the conclusion of the sentencing phase of the jury trial, "the trial court did not find either statutory mental health mitigator[s] because it found that, given the lack of evidence supporting Ponticelli's cocaine use within twenty-four hours of the crime, [Dr.] Mills['s] testimony was speculative." Ponticelli III, 941 So. 2d at 1093. The lack of evidence of Mr. Ponticelli's cocaine use is not surprising in

---

his convictions. Regardless of the state trial court's credibility findings as to the defense counsel's and the prosecutor's conflicting testimony about the prosecutor's notes, Tim Keesee testified in the postconviction hearing that his trial testimony was false; that he had seen Mr. Ponticelli use cocaine at the Grandinettis' trailer on the evening of the homicides; and that he told the state's investigator Bruce Munster this. See Ponticelli III, 941 So.2d at 1089. Detective Munster corroborated Keesee's testimony on this point during his postconviction testimony. Thus, regardless of the prosecutor's notes and testimony, ignoring this unrebutted evidence that Detective Munster, whose knowledge is charged to the prosecution, knew that Keesee's testimony was false renders the state's factual determination unreasonable. See id. at 1090.

    While I conclude that Mr. Ponticelli was not prejudiced by this suppression of evidence on the question of his guilt or innocence, I cannot say the same with regard to the sentence of death. For me, the materiality of the Brady and Giglio violations with respect to Mr. Ponticelli's death sentence is plain because the evidence relates to his drug use on the day of the offense. This is consistent with what the Supreme Court has recognized: this kind of evidence may be material to a capital jury's penalty phase deliberations. See Cone v. Bell, 556 U.S. 449, 470–75, 129 S. Ct. 1769, 1783–86 (2009). Here, Mr. Ponticelli's drug use on the day of the offense was disputed by the state during the penalty phase. Although the defense attempted to elicit testimony and argue that Mr. Ponticelli's paranoid behavior demonstrated he was impaired by drug use near the time of the offense, the state implored the jury to infer that Mr. Ponticelli's behavior was attributable to his criminal activity. Indeed, the materiality of this evidence is further established by the Florida Supreme Court's direct appeal opinion affirming the trial court's determination that Mr. Ponticelli failed to prove the existence of statutory mitigating circumstances in part because there was no evidence presented at Mr. Ponticelli's jury trial that he was using cocaine on the evening of the murders. See Ponticelli v. State, 593 So. 2d 483, 490–491 (Fla. 1991) (Ponticelli I), vacated and remanded sub nom. Ponticelli v. Florida, 506 U.S. 802, 113 S. Ct. 32 (1992) (remanding for reconsideration in light of Espinosa v. Florida, 505 U.S. 1079, 112 S. Ct. 2926 (1992)), remanded to Ponticelli v. State, 618 So. 2d 154 (Fla. 1993) (Ponticelli II) (affirming convictions and sentence).

that Dr. Mills had not interviewed Mr. Ponticelli for the purpose of investigating or developing potential mitigation and neither had Dr. Mills been exposed to evidence such as Tim Keesee's and Frank Porcillo's eyewitness accounts of, respectively, Ponticelli's drug use and intoxication around the time of the offense. Given the unsubstantiated and incomplete nature of Dr. Mills's hypothetical testimony, neither the jury nor the judge had a basis for finding the statutory mental state mitigating circumstances.

By contrast, the postconviction evidence painted a starkly different portrait of Mr. Ponticelli than that presented during his jury trial. The postconviction evidence included Mr. Ponticelli's early childhood difficulties, together with the fact that he had been born a "blue baby" which likely resulted in brain damage. Mr. Ponticelli was placed in foster care when he was only just months old. Mr. Ponticelli began abusing drugs as a youth.[3] These early childhood difficulties, which the jury never heard anything about, represent the "kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." See Wiggins v. Smith, 539 U.S. 510, 535, 123 S. Ct. 2527, 2542 (2003).

---

[3] At the state court postconviction hearing, witnesses testified that Mr. Ponticelli began using marijuana and alcohol in junior high school, sometime between the ages of thirteen, fourteen, and fifteen years old, and then continued and increased his drug use in high school to more serious drugs, such as black beauties, mescaline, hashish, Valium, and cocaine.

This postconviction mitigating evidence has particular significance here, first because it is constitutionally relevant evidence. See Roper v. Simmons, 543 U.S. 551, 568, 125 S. Ct. 1183, 1194 (2005) ("In any capital case a defendant has wide latitude to raise as a mitigating factor any aspect of his or her character or record . . . ." (quotation marks and alterations omitted)). Second, it is significant because it supports the existence of two mental state statutory mitigating circumstances under Florida law. See Fla. Stat. § 921.141(6)(b), (f). In his postconviction proceedings, Mr. Ponticelli presented the testimony of three experts who agreed that his cocaine use on the day of the offense, coupled with his lengthy and severe history of cocaine addiction, supported a conclusion that he was under an extreme emotional disturbance at the time of the crime. See Ponticelli III, 941 So. 2d at 1093. The three experts also agreed that this evidence showed Mr. Ponticelli's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. See id.

While it is certainly true that the state's mental health expert Dr. Conger disagreed,[4] it is not the job of this Court to resolve disputes in the evidence. Our

---

[4] Dr. Conger opined that Mr. Ponticelli's mental state at the time of the offense did not rise to the level to support statutory mitigators. Nevertheless, Dr. Conger agreed on cross-examination that the "record would certainly suggest" that Mr. Ponticelli "was not a cold-blooded murderer, and he was highly stressed during and after the homicides."

job is to determine whether there is a reasonable probability that the testimony of Mr. Ponticelli's experts would have affected the jurors' appraisal of his moral culpability. In my view there is. For one thing, the opinions of Mr. Ponticelli's experts do not suffer from the same infirmities as Dr. Mills's testimony. Unlike Dr. Mills, who testified to a factually inaccurate hypothetical based upon a constitutionally inadequate background investigation, the opinions of the experts who testified in postconviction proceedings were substantiated and corroborated by extensive evidence, including evidence of Mr. Ponticelli's drug use on the day of the offense.

I am certainly aware that not all of the postconviction evidence presented was favorable to Mr. Ponticelli. For example, as Judge Pryor suggests, trial counsel's portrayal of Mr. Ponticelli as a naive drug user during the penalty phase may be more sympathetic than the reality that he had a longstanding drug addiction and relapsed only weeks prior to the offense.[5] Although I recognize the force of this argument, the positives and negatives of this aspect of Mr.

---

[5] Dr. Conger suggested that Mr. Ponticelli may have an antisocial personality disorder based upon one personality test administered by him, but he did not diagnose Mr. Ponticelli with this disorder. Even if we were to assume that Dr. Conger had determined that Mr. Ponticelli met all of the diagnostic criteria for antisocial personality disorder, such a diagnosis, although harmful, does not preclude a conclusion of prejudice. See Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1340, 1253–56 (11th Cir. 2011) (granting habeas corpus relief based upon ineffective assistance of counsel at penalty phase even though defendant's own psychologist diagnosed the defendant with antisocial personality disorder).

Ponticelli's background do not foreclose a finding of <u>Strickland</u> prejudice. The Supreme Court has found prejudice in several cases where the evidence had both good and bad properties. <u>See</u> <u>Porter</u>, 130 S. Ct. at 455 (holding that the habeas petitioner was prejudiced by his counsel's failure to present evidence of his military service even though such evidence would have also shown that he "went AWOL on more than one occasion"); <u>Williams</u>, 529 U.S. at 396, 120 S. Ct. at 1514 (holding that defense counsel's failure to present juvenile records involving child abuse, mental capacity, and incarceration was deficient, even though "not all the additional evidence was favorable to" the petitioner); <u>id.</u> at 398–99, 120 S. Ct. at 1515–16 (holding that the state trial judge had correctly found prejudice from the failure to introduce the juvenile records); <u>cf.</u> <u>Sears v. Upton</u>, ___ U.S. ___, ___, 130 S. Ct. 3259, 3264 (2010) (stating "the fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising . . . given that counsel's initial mitigation investigation was constitutionally inadequate. Competent counsel should have been able to turn some of the adverse evidence into a positive . . . ."); <u>Rompilla</u>, 545 U.S. at 390–93, 125 S. Ct. at 2467–69 (holding that habeas petitioner was prejudiced by the failure of his defense counsel to examine and present evidence from the records of his prior

conviction). With this in mind, I say Mr. Ponticelli's relapse does not vitiate the conclusion that he has shown prejudice based upon the record in his case.

For example, the fact of a relapse and prejudice are not mutually exclusive in light of the early onset of Mr. Ponticelli's drug addiction, as well as the reality that people who suffer from drug addiction sometimes succumb to their addiction and relapse. See, e.g, Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1355 n.20 (11th Cir. 2011) ("We acknowledge that evidence of alcoholism and drug abuse is often a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing. However, we credit [the defendant's] evidence of alcohol abuse beginning at age 11 as mitigation, as it was used as a way to escape his horrible background." (quotation marks and citation omitted)); cf. Roper, 543 U.S. at 569–70, 125 S. Ct. at 1195–96 (recognizing, generally, the differences between juvenile and adult offenders in terms of moral culpability); id. at 570, 125 S. Ct. at 1195 ("The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.'" (quoting Thompson v. Oklahoma, 487 U.S. 815, 835, 108 S. Ct. 2687, 2699 (1988) (plurality opinion))).

On the aggravation side of the ledger, the jury recommended death by a vote of nine to three for the murders of both Nick and Ralph Grandinetti. The trial

court found two aggravating factors applied to the murder of each man: (1) the homicides were committed for pecuniary gain, see Fla. Stat. § 921.141(5)(f); and (2) the homicides were "committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification," which is referred to as the CCP aggravator, see id. § 921.141(5)(i). The trial court also found that Nick Grandinetti's murder was "especially heinous, atrocious, or cruel," a factor often referred to as the HAC aggravator. Id. § 921.141(5)(h). The CCP and HAC aggravators have been recognized as "two of the most serious aggravators set out in [Florida's] statutory sentencing scheme." Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999). But together with the mitigating evidence never heard by them, the judge and jury may have evaluated the CCP factor differently. They may have given it different weight to the extent that the additional mitigating evidence substantiated Mr. Ponticelli's claim that he met the criteria for Florida's statutory mental health mitigators.

In sum, I conclude that had the judge and jury been able to consider Mr. Ponticelli's life history and drug use at the time of the offense, together with his young age and lack of criminal history, on the mitigating side of the scale, and reduce the strength of the CCP aggravating factor on the other side of the scale, there is a reasonable probability that the sentencing judge and jury "would have

struck a different balance." <u>Wiggins</u>, 539 U.S. at 537, 123 S. Ct. at 2543; <u>see also</u> <u>Porter</u>, 130 S. Ct. at 454. Even without the new and compelling evidence presented at the postconviction hearing, three of Mr. Ponticelli's original jurors voted for life based upon nothing more than two statutory mitigating circumstances, his youth and lack of criminal history. Had his jury been presented with the considerable mitigating evidence adduced during the postconviction proceedings—including the corroborated opinions of three mental health experts as to the existence of Florida's statutory mental health mitigators, coupled with the two strong statutory mitigating circumstances already found by the sentencing court—"there is a reasonable probability that it would have returned with a different sentence." <u>Wiggins</u>, 539 U.S. at 536, 123 S. Ct. at 2543. Although we cannot be completely certain that the outcome would have been different, <u>Strickland</u> does not require that of us. <u>See</u> 466 U.S. at 693, 104 S. Ct. at 2068 (stating that, to show prejudice, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). Rather, a defendant need only demonstrate a reasonable probability of a different outcome. <u>Id.</u> at 694, 104 S. Ct. at 2068. For these reasons, I would grant Mr. Ponticelli habeas relief as to his claim of ineffective assistance of counsel at the penalty phase of his trial, and I respectfully dissent from the denial of this relief.